James R. **MILLSAP, et al.   Plaintiffs,**

v.

**MCDONNELL DOUGLAS COR-PORATION, a foreign cor-poration, Defendant.**

**No. 94CV633.**

United States District Court,
N.D. Oklahoma.

Sept. 5, 2001.

Joseph R. Farris, James David Mustain, Tony Michael Graham, Feldman, Franden, Woodward, Farris & Taylor, Tulsa, OK, J. Derek Ingle, Wilson, Cain & Acquaviva, Tulsa, OK, Michael M. Mulder, Joan H. Burger, Thomas R. Meites, Josie Raimond, Meites, Frackman, Mulder & Burger, Christopher G. Mackaronis, Bell, Boyd & Lloyd, Washington, DC, for Plaintiffs.

Thomas Dunn Robertson, S.M. Fallis, Jr., Carl D. Hall, Jr., Paula J. Lynch, John Edward Harper, Jr., Nichols, Wolfe, Stamper, Nally & Fallis, Tulsa, OK, for Defendant.

### ORDER

HOLMES, District Judge.

This matter comes before the Court on Plaintiffs' claims arising under 42 U.S. § 1140, the Employee Retirement Income Security Act ("ERISA"). A trial was held in this case April 19–29, 1999. Following the trial, a number of additional proceedings were conducted with respect to certain issues raised at trial.

Based upon a review of the entire record, the Court hereby enters the following findings of fact and conclusions of law.

### I. FINDINGS OF FACTS

1. McDonnell Douglas Corporation ("MDC") was a corporation headquartered

in St. Louis, Missouri. In 1996, MDC was acquired by Boeing Corporation.

2. MDC manufactured and assembled military and commercial aircraft, missile systems, electronics and related products at facilities throughout the United States, and in foreign countries. .

3. MDC long maintained a plant in Tulsa, Oklahoma. The plant was owned by the U.S. Air Force, and was known as Air Force Plant No. 3. The plant was originally used for the manufacturing of bombers in World War II, and was later used by MDC to perform work under various military contracts with the United States Government.

4. MDC's Tulsa facility was part of McDonnell Douglas Aerospace—East ("MDA–East"), an unincorporated operating division managed out of the St. Louis headquarters. The primary business of MDA–East was to manufacture and assemble military products, including fighter and attack aircraft, helicopters, and missile systems.

5. Plaintiffs are former employees of MDC at the Tulsa, Oklahoma plant. Plaintiffs were employed by MDC as of December 3, 1993, when the company announced the plant would be shut down.

6. While employed at MDC, Plaintiffs participated in one of MDC's two Employee Retirement Income Security Act ("ERISA") qualified retirement plans and one of MDC's retiree health care plans.

7. Plaintiffs brought this class action alleging that MDC violated Plaintiffs' rights under ERISA, 29 U.S.C. § 1001–1461. This Court certified this lawsuit as a class action of over 1,000 persons who were formerly employed by Defendant when it announced the Tulsa plant closing. Plaintiffs claim that MDC closed its Tulsa facilities for the purpose of depriving Plaintiffs of benefits covered by ERISA, in violation of section 510 of the statute.

## A. *Background*

8. In the late 1980's and early 1990's, the amount of government defense contracting work available to MDC and other defense contractors was declining.

9. On June 20, 1990, John McDonnell issued a memorandum to all employees entitled "The Hard Reality." In this memo, Mr. McDonnell informed MDC employees that the company needed to reduce annual expenditures by $700 million a year. These expenditures were to come from all segments of the company and, according to the McDonnell memo, would include reductions in force that would affect the company's employees, of which there were then about 130,000 worldwide.

10. In 1991, MDC became concerned that its orders for production of the F–15 fighter jet had diminished to the point that there was a possibility the production line could go dead. While the company worked on the remaining orders from the United States Air Force, the Saudi government in 1991 expressed an interest in placing a substantial order for F–15's. The $9 billion Saudi order was of significant interest to employees at the Tulsa facility, where the F–15 aft-tail section for the planes was assembled, as well as the entire Tulsa community. The contract, however, was contingent upon approval by the United States Government in two respects: first, the President of the United States had to approve the sale, and second, the U.S. Congress thereafter had 30 days within which to pass a resolution overturning his decision.

11. In 1991 and 1992, Oklahoma's political delegation had considerable influence on defense matters. MDC personnel would later describe Oklahoma's delegation as follows: "Oklahoma's public officials as a group make that state perhaps the most potentially dangerous politically." Pltfs.Tr.Ex. 71, M152 003 0859.

12. In order to gain the political support it needed to win approval of the F–15 contract, the company repeatedly represented that MDC would preserve the jobs of its Tulsa employees if the F–15 sale was approved by the government.

13. Such representations were contained in MDC's 1991 Annual Report, which stated that award of the F–15 Saudi Arabia contract meant the preservation of "7,000 jobs" at the company:

Saudi Arabia expressed an interest in 1991 in expanding its F–15 fleet with the purchase of additional 72 Eagles. U.S. Government approval of the Saudi request would extend production of the F–15 to 1997 and preserve 7,000 jobs at MDC and another 33,000 jobs at subcontractors and suppliers nationwide.

Pltfs.Tr.Ex. 35, M152 005 0277.

14. MDC indicated that a substantial number of these "preserved jobs" would be in Tulsa. Tulsa plant manager Don Bittle testified:

In early '92 the company decided to have a series of U.S. Jobs Rally Now, of which Tulsa participated in, I believe it was May of '92. We invited, and they did attend, not only the local politicians but the national politicians, including the Governor of Oklahoma, all met with us and we had a rally out at Air Force Plant 3 extolling the need to have this sale made to continue jobs here at Tulsa. We also had Warren Beaver [Owen Bieber] who was the national leader of the UAW was here, also extolling that position, that that sale needed to go through to preserve the jobs at not only at St. Louis, but at Tulsa for the parts we were building.

Tr. 257.

15. At the rally in Tulsa, the employees, at Defendant's request, all signed a "huge" letter, urging the President to approve the sale and Congress not to override this decision. After the rally, workers were asked on numerous occasions to continue to lobby their congressional representatives in favor of the sale. Plaintiff Vera Lehman testified:

Yes, we had a rally—we had several rallies, but in May of '92 we had the 50th anniversary of McDonnell Douglas being in Tulsa. We had several officials from McDonnell Douglas, the corporate office, including Mr. Al Briggs and whatever, to lobby our congressmen that in the event that the president did offer them or suggest that they go ahead and sell that plane to the Saudis, that they would, you know, agree to that without any opposition. We signed a huge, huge letter, I mean all the employees signed this card that we sent to them, we wrote them, we called them. You know we were encouraged constantly to stay in contact with those people to have them to approve that sale.

Tr. 64–65.

16. Named Plaintiffs James Millsap, Fred Davis and Vera Lehman were employees with many years of service at MDC's Tulsa facility until the plant closed. Prior to the facility closing, they recalled being told on multiple occasions that if the company was awarded the F–15 contract with the Saudi government, the plant would be open for at least three more years. They were asked by the company to write letters and to sign cards, not only to their Congressmen but also to the President.

17. In response to these requests by MDC, the union and the company's employees lobbied the Oklahoma political delegation with letters and calls. The promise of at least three more years of work was made not only to MDC employees, but also at the job rally at which the President of the United States and several members of the Oklahoma congressional delegation were present. These promises were re-

peated on other occasions by the President of McDonnell Douglas Aerospace, John Capellupo, and the former general manager of the plant, Al Briggs, his successor, Don Bittle, and the plant director, Joe White. In addition, members of the Oklahoma political delegation were heard repeating the same promise to employees during their various visits to the plant.

18. On September 11, 1992, President Bush announced at a McDonnell Douglas job rally held in St. Louis that he had approved the $9 billion sale of the 72 F–15's to the Saudi government. This message was broadcast to employees and the public at the Tulsa plant, where a similar rally was underway.

19. The company's public relations staff took this occasion to repeat the representation from its 1991 Annual Report. The language was repeated almost verbatim from the Annual Report, only it specified that Tulsa was one of the locations where the work was to be preserved. The *Tulsa World* reported the company's representation on September 12, 1992:

> McDonnell Douglas said the sale will extend production of the F–15 for at least three years and preserve 7,000 jobs in Tulsa and St. Louis.

Pltfs.Tr.Ex. 42 p. 1.

20. Such representations continued even after the Congressional disapproval period had expired. The company continued to feature its political campaign in its literature. It used a picture of members of its workforce standing under an American flag for the front and back cover of its 1992 Annual Report. This Annual Report contained a description of the event as: "Teammates celebrate announcement of an overseas sale, which will extend F–15 pro-

duction for several years." Pltfs.Tr.Ex. 50.

\*   \*   \*   \*   \*   \*

21. In 1991, a team was formed to study the production capabilities of MDA–East, and to recommend any changes which might be appropriate. This study team was lead by Baxter Tate. Mr. Tate's group subsequently recommended that the Culver City, Torrence, and Columbus facilities be closed, and that recommendation was accepted by MDC's management. The closing of Culver City was announced in February, 1991; the closing of Torrence was announced in June, 1992; and, the closing of Columbus was announced in August, 1992.

22. At the time of the 1991 study, Torrence, Culver City and Columbus were all operating at about 25 to 30% of capacity.

23. In 1992, Peter Juliano assumed the duties of Vice–President and General Manager of MDA–East. Because of the decline in business and excess capacity within MDC's facilities, Mr. Juliano was assigned, in late July, 1993, to study the capacity of MDA–East plants, and recommend any appropriate action. This review was named "Project M."

24. The Project M team began actively studying the Tulsa plant as a candidate for closure by August 1993.

25. The Project M team was also charged with determining, if necessary, how to transition the MDC Tulsa work to another MDC facility.

\*   \*   \*   \*   \*   \*

26. In a February 26, 1993 letter to "All Shareholders & Teammates"[1] in the company's 1992 Annual Report, Chairman McDonnell acknowledged the benefit it

---

1. Mr. McDonnell testified that he referred to MDC employees in his company-wide communications as "teammates."

had received from the lobbying efforts by its employees:

> The Saudi Arabian F–15 win was a great example of teamwork at a grass-roots level. Thousands of people at MDC and its suppliers joined together in rallying U.S. Congressional and Presidential support for the sale.

Pltfs.Tr.Ex. 50 M152 005 0329. Mr. McDonnell once again concluded his remarks by stating that the sale resulted in "preserving 7,000 jobs at MDC." *Id.*

27. Later, on March 10, 1993, the company's Director of Industrial Participation, James Caldwell, who was one of the company's employees involved with lobbying the Oklahoma delegation, wrote to the Mayor of Tulsa, Susan Savage. Mr. Caldwell thanked Mayor Savage for the City's help with the F–15 contract. Mr. Caldwell repeated the same three year commitment the company made to its Tulsa employees, the public and the political representatives:

> As you know, the Saudi F–15 program is a core business base that will keep us operating at Tulsa for the next three years. That program is proceeding and we are very close to getting a final contractual commitment from the Saudi government.

Pltfs.Tr.Ex. 173.

28. Also, in 1993, the Air Force was talking with officials of the City of Tulsa concerning the possibility of transferring title to AF Plant No. 3 to the City, for nominal consideration. This would allow the City of Tulsa to act as the landlord for MDC and Rockwell International, the tenants of AF Plant No. 3. The City of Tulsa would then offer space to MDC and Rockwell at favorable terms to induce them to continue to occupy the building.

*      *      *      *      *      *

29. Project M was headed by Peter Juliano, General Manger of Production Operations, who in turn reported to John Capellupo, President of McDonnell Douglas Aerospace.

30. The Project M team was comprised of at least 60 persons who were authorized to have access to its confidential studies. The Project M team examined the financial and non-financial impact of closing the MDC plant in Tulsa. One of the non-financial impacts assessed by the Project M team was the political ramifications of closing the plant.

31. Mr. Juliano's Project M team gathered data from a variety of sources, and studied the feasibility of closing one or more of the MDA–East facilities. Tulsa was identified as a prime candidate for closure. According to MDC, St. Louis could not be closed as that was the company headquarters, the site for all engineering and technical support, the designated point of delivery for MDC's products, and was too large to be absorbed into Tulsa or any other MDA–East facility; the Mesa, Arizona plant was not a prime candidate for closure as it was a relatively new facility which was owned by MDC, and had almost $100 million in costs sunk into the facility. It was also designated as the point of delivery for MDC's helicopters, and had a firing range for testing helicopter armament; and the Titusville, Florida facility could not then be closed as MDC was bidding to become the sole source supplier of the Tomahawk cruise missile, which was manufactured and assembled in Titusville.

32. Mr. Juliano's team was unable to identify any large program on the horizon which MDC might be able to obtain and put into Tulsa.

33. The Project M team prepared several drafts of its report, adding information that its members compiled from various sources within MDC.

34. The Project M team ultimately produced a condensed version of its report in an executive summary to Mr. Capellupo, recommending that MDC close its Tulsa facility.

35. Don Bittle, the General Manager of the Tulsa facility, was not involved in Project M, nor was he kept informed of the progress of Project M.

36. Mr. Capellupo testified that he made the ultimate decision to close Tulsa. Therefore, any significant meeting with Mr. Capellupo was, by definition, a meeting involving the ultimate decision makers.

37. Mr. Capellupo formally recommended that MDC close its Tulsa facility. Mr. Capellupo provided Chairman McDonnell and the MDC Executive Council with a condensed version of the Project M report. In accordance with his authorization, the Executive Council accepted Mr. Capellupo's recommendation and ordered MDC Tulsa closed.

38. On December 3, 1993, MDC publicly announced its intention to close MDC Tulsa. In addition to the public announcement, MDC provided its reasons for closing Tulsa to the United States Government in a written Notice which was required by defense contract regulations.

39. Subsequent to the Tulsa closing, MDC did not win the contract to be the sole source supplier for Tomahawk missiles, and thereafter announced the closing of the Titusville facility in March, 1995, with the plant actually closing in August, 1995. MDC announced the closing of one building at the St. Charles facility, which produced wire bundles, in March of 1995, with the facility actually closing in December, 1995. This left only three facilities in MDA–East: St. Louis, St. Charles, and Mesa. The process of reducing expenses, as announced in Chairman McDonnell's "Hard Reality" program, resulted in the closing of four out of the seven facilities in MDA–East from 1991 through 1995.

40. MDC moved the F–15 work from MDC Tulsa to MDC's St. Louis, Missouri facility.

41. Plaintiffs filed this lawsuit in June, 1994.

## B. *Plaintiffs' Affirmative Case*

### i. *Hard Reality*

42. As noted above, beginning in 1990 and continuing in 1994, MDC implemented a series of layoffs and plant closings in connection with Chairman McDonnell's "Hard Reality" program.

43. During this same time period, MDC's pension plans were substantially overfunded. The surplus in the pension plans contributed to the company's yearly earnings by generating income and favorably impacting the company's bottom line.

44. From the beginning of "Hard Reality," MDC discussed ways to maximize its pension surplus by focusing on the relationship between plant closings and older, more senior workers approaching eligibility for pension and other benefits. Within two days of the announcement of "Hard Reality," Defendant was told by its outside actuaries that tremendous additional savings were available if the persons laid off were older and more senior. Thereafter, on almost a monthly basis, Defendant monitored the pension savings on its ongoing layoff and plant closing program.

45. The Tulsa plant was no exception. MDC was tracking its pension gains segment by segment from 1990 to 1994. Thus, it had information about past layoffs at Tulsa and the amount of the gains that had been achieved. The data provided the outside actuaries by the company allowed it to determine by segment or plant the average age and length of service of the employees it laid off.

46. Documents obtained from MDC's outside accountants and actuaries demon-

strate that from the outset of the "Hard Reality" program, MDC was aware of substantial cost reductions through pension and benefit savings. Many of the documents from the outside actuaries were sent to Richard Smoski, MDC's director of pension, savings and payrolls, and William Chase, MDC's treasurer. Mr. Chase in turn reported to the company's chief financial officer, Herb Lanese, who in turn reported directly to Chairman McDonnell.

47. When deposed, Mr. Smoski acknowledged that he was involved in creating pension saving projections for the Chairman's "Hard Reality" program. He participated in meetings with MDC's outside actuaries, Alexander & Alexander, concerning how the pension gains would impact the company's earnings.

48. Mr. Smoski and other MDC managers met with Alexander & Alexander to consider various "what if" scenarios, analyzing the effect on costs and savings if the company decided to reduce heads. Mr. Smoski testified that the kinds of costs he analyzed included "pension cost, savings cost, savings plan cost, health care cost, and just direct overhead cost." 02/03/98 Smoski Dep.Tr. at 7. "A lot of them were 'what if,' if we reduced—if head counts were reduced by one thousand, or two thousand, what impact did that have to do on the pension plan." *Id.* at 5. According to Mr. Smoski, the actuarial analysis included whether these "what if" scenarios would impact the company's earnings.

49. MDC also asked its actuaries to study whether staff reductions would cause it to contribute to the pension plan earlier than expected and to make sure MDC's government accounting people knew of the contribution situation. The outside actuaries looked at the impact of the layoffs on the company's financial accounting with respect to its pension benefit obligations, and performed similar studies on the financial accounting for the retiree health care plans. In order for Alexander and Alexander to perform its analysis, Mr. Smoski provided it with current headcount data directly from his office and with projected-cuts data from the treasury area.

ii. *Memorandum On Demographics*

50. Within two days of Chairman McDonell's "Hard Reality" announcement, David Strom, an Alexander & Alexander actuary, sent a memorandum to Mr. Smoski entitled "Re: Layoffs." The "Re: Layoffs" memo presented Alexander & Alexander's calculation of MDC's curtailment gains. A "curtailment gain" is an accounting and actuarial term which refers to corporate pension savings resulting from a reduction of a liability that is already booked in the financial statement of the company. MDC booked the pension surplus as an asset in its financial statements. In years when there were curtailment gains, the gains would be reflected in the company's income statements. The company's bottom line would be positively affected as net earnings were increased by the amount of the gain.

51. The memo from Mr. Strom informed Mr. Smoski that the layoffs would improve the funded status of the pension plans by extending the time the plans would be in full funding status. This was of interest to the company because in a fully funded status, MDC would not accrue any additional pension costs until such time as it was no longer fully funded.

52. In the "Re: Layoffs" memo, Mr. Strom linked the size of pension gains with the age and seniority of the workforce selected for closing. Mr. Strom told Mr. Smoski that Alexander & Alexander had previously estimated a $6.5 million curtailment gain attributable to a recent layoff of 2,300 salaried employees at Douglas Aircraft Corporation, a wholly-owned subsidiary of MDC. Mr. Strom's memo informed

Mr. Smoski that if the same demographics from an earlier reduction involving the Douglas Aircraft segment of the company applied to the mass layoffs projected under MDC's "Hard Reality," "the curtailment gain attributable to 20,000 layoffs company wide would be $57,000,000 ..." Pltfs.Tr.Ex. 2, Tr. 92.

53. Mr. Strom went on to project a total curtailment gain as high as $125 million, if the 20,000 layoffs were based on MDC's particular demographics, rather than the younger demographics actually encountered in the earlier reduction. The attachment to the Strom memo showed that even small differences in the demographics of the population selected for layoff could make a large difference. The demographics of the earlier layoff involving the DAC segment had an average age of 39.84 and average service of 8.11. The across-the-board average used to project a $125 million gain was 40.3 years of age and 10.07 years of service. If an older population with greater service was terminated, the pension gain would be greater.

54. Strom's "Re: Layoffs" memo was widely circulated within the company and was provided to MDC's Treasurer, J.W. Chase, its Controller, R.C. Brand, Manager of Financial Reporting, Gary T. Gray, and Manager–Operating Plan, William J. Dowdy.

### iii. *Tulsa Fit the Demographic Model*

55. The employees at the Tulsa plant fit the demographic profile identified by MDC's outside actuaries; on average they were the oldest and most senior employees in the company, as seen in Plaintiffs' Demonstrative Exhibit 9:

MCDONNELL DOUGLAS
AVERAGE AGE AND SENIORITY
BY FACILITY

1993

| | Hourly Employees Average | | Salaried Employees Average | |
| --- | --- | --- | --- | --- |
| Facility | Average Age (1) | Years of Service (2) | Average Age (3) | Years of Service (4) |
| Tulsa | 50.95 | 19.68 | 49.27 | 18.71 |
| Torrence | 50.02 | 22.65 | 46.88 | 17.68 |
| St. Louis | 46.44 | 19.70 | 42.24 | 15.06 |
| Columbus | 46.32 | 4.89 | 44.02 | 6.51 |
| St. Charles | 45.58 | 16.04 | 44.06 | 15.86 |
| Mesa | 44.55 | 6.55 | 43.85 | 9.95 |
| Titusville | 43.52 | 10.11 | 44.71 | 12.70 |

56. Plaintiffs' statistical expert, Leonard Cupingood, found the average age among Tulsa hourly employees was 50.95. That average age was the highest of the facilities reviewed for possible shutdown. Similarly, the average age of the Tulsa salaried employees at year end 1993 was 49.27. That average exceeded the average age of the salaried work force at MDC's other plants. Tulsa also had salaried employees with the highest average length of service at 18.71 years. As for hourly employees, Tulsa had the second highest average years of service, second only to the Torrence facility, where the average years of service was 22.65 years compared to Tulsa's 19.68 years.

57. At trial, Plaintiffs offered Lawrence Beebe as an expert witness. Mr. Beebe, a certified public accountant, specializes in employee benefit plans. Mr. Beebe testified that he had never advised his clients to lay off workers based on demographics and never would because it would interfere with the benefits to which the employees might be entitled.

58. In addition to the Strom memo, Plaintiffs introduced a number of other documents showing that the company was well aware of how the demographics of its employees could influence the amount of its pension surplus. Plaintiffs' evidence at trial established that MDC was comparing its various plants by the number of employees each had in the 50–to–54–year–old age group with the 55 and above age group. By selecting a plant with a high number of employees in the 50–to–54–year–old age group, the company would

achieve a higher gain. This is because, under the terms of the pension plan, employees who reached age 55 with 10 years of service would receive greater benefits by qualifying for an early or normal retirement. On the other hand, employees under 55 when they were laid off would receive a deferred vested pension, with the diminished amount of pension compared to those who reached age 55.

59. The study counting the number of employees who were approaching age 55 was entitled the "Voluntary Work Force Buffer Program" and was stamped "MDC SENSITIVE." The study indicated that by 1994 the Tulsa workforce would shrink to about 1,500 employees. Of the remaining 1,500 approximately 300 would be in the 50 to 54 age group with 10 years or greater service. In this regard, Mr. Beebe testified that closing the Tulsa plant in January 1, 1994, before the 300 employees turned 55, would increase the company's curtailment gain.

60. MDC also knew how much it would save if the individuals did not reach age 55 before they were laid off. In Plaintiffs' Trial Exhibit 28, Mr. Strom, the company's outside actuary, provided to Mr. Chase, MDC's treasurer, the cost for offering such individuals early retirement. Mr. Strom estimated that these 50–54 year old employees would cost MDC from $79,000 to $86,000 per individual. According to Mr. Beebe, if the converse occurred, and these 50–54 year-olds left MDC before age 55, the company would achieve a savings in these same amounts. Thus, by closing down the Tulsa plant before 1994, and laying off roughly 300 aging workers, MDC stood to reap $18 million in pension savings.

61. Mr. Beebe testified that standards established by the Financial Accounting Standards Board required that curtailment gains and losses be tracked and recorded on at least an annual basis.

#### iv. *Health Care Coverage Costs*

62. MDC also priced the cost of providing medical benefits to the group who would cross over to 55 in 1994. In a July 31, 1991, letter from Mr. Strom to Mr. Smoski, the company considered providing health care coverage for employees age 50 to 54 who did not otherwise qualify for the benefit in a division of the company that had recently been sold. The Strom letter valued the cost of the medical benefit at $73,000. As with its pension analysis of groups crossing over to 55, if the company did not offer the benefit and instead laid off people in advance of the qualifying age of 55, it would save on average $73,000 a person.

63. If the Tulsa plant closed before 1994, and the projected 299 employees who were less than 55 were prevented from qualifying for medical benefits by being terminated before age 55, the company would save $6,717,000 in medical coverage expenses.

64. Closing the plant by 1994 would save the company both medical coverage ($6.7 million) and pension savings ($18 million), for a total of $24.7 million. That $24.7 million savings would certainly be material in a transaction where the company calculated the Tulsa plant closing would otherwise generate $19 million in savings over a five-year period.

#### v. *The Pension Surplus was Valuable to the Company*

65. The documents also establish that the Defendant was interested in finding ways it could use or monetize the pension surplus. These considerations existed throughout the "Hard Reality" years and continued past the time the Tulsa plant was closed. For example, the company used the surplus to take care of the company's concern with rising costs of health care insurance.

66. MDC's Executive Council knew about the large surpluses in the salaried pension plan. The pension surplus continued to be an issue for MDC from 1991 through 1993. By early 1991, MDC focused on the cost of company-paid health care coverage for both its current and future retirees. MDC management employees Rich Smoski, James Proffitt, William Austin, Mike Becker and Ruth Reeg prepared studies of these costs and shared them with Chairman McDonnell and Chief Financial Officer Herb Lanese.

67. On October 8, 1992, effective January 1, 1993, MDC terminated company-paid retiree health care coverage for both current and future non-union retirees and their dependents. After this change the non-union salaried health care coverage was entirely funded by retiree contributions.

68. Mr. Smoski, one of the persons involved in preparing these studies, testified that what motivated MDC to terminate retiree health care coverage for its current and future salaried retirees was cost. The decision to end retiree health care coverage not only impacted MDC Tulsa retirees, but salaried members of the Plaintiff class who would no longer be entitled to have their health care paid for by the company when they retired. In addition, under the collective bargaining agreement hourly workers who had not crossed over the age of 55 when the plant closed received no retiree health care coverage.

69. Mark H. Allen also testified as an expert witness for Plaintiffs. Mr. Allen's expertise was in the area of employee benefits and mergers and acquisitions. As a business lawyer, Mr. Allen conducts a broad range of business work and is involved with mergers and acquisitions and employee benefits. Mr. Allen testified that MDC pension plans were in an overfunded status and that the overfunded sta-

tus of the plans resulted in value to the company.

70. Based upon a review of the Defendant's summary plan descriptions and annual reports, Mr. Allen found that the plans were substantially overfunded in 1992 and 1993. Mr. Allen identified a number of reasons why it would be good for an employer to have an overfunded pension plan. The predominant reason to overfund a plan is to effectuate the prepayment of future retirement benefits, while the monies invested in the plan accrue income tax free.

71. Once a company like MDC has an overfunded plan, the company may use the surplus funds for corporate purposes. For example, the MDC annual report showed the overfunding was used to pay retiree health benefits. MDC was able to monetize the $385 million from the pension plans because it was able to use plan assets, instead of other cash to pay for health insurance benefits. In this way, the company was able to use the surplus to assist its cash flow. The paragraph entitled "corporate cash flow" addressed this issue stating:

> Assuming that after any transfer of the pension plan continues to be in full funding, MDC would clearly improve its corporate cash flow for some period of time. Retiree medical benefit dollars that would have been paid from company assets would now come from pension assets.

Tr. 188, Pltfs.Tr.Ex. 6.

72. Both Mr. Beebe and Mr. Allen stated that MDC's overfunded pension surplus could be used to establish an Employee Stock Ownership Plan ("ESOP"). Mr. Allen also testified that, in addition to the main advantage of having pension expenses prepaid, the other possible uses of the asset of pension overfunding were to pay to retirees, as MDC had done after it

ceased providing health care insurance to salaried retirees; to terminate the plan and recapture the overfunding; in a merger setting, the purchaser can use the overfunding if it has an underfunded plan, and there are different plan mergers vehicles to effect this end.

73. The financial community noted MDC's use of the surplus cost to reduce its health care costs. For example, on November 12, 1993, Morgan Stanley reported the following:

> *Pension Uses* MD's pension fund remains significantly overfunded. The company has already used the surplus to reduce health care cost and will continue to pursue other similar avenues to monetize the asset.

Pltfs.Tr.Ex. 80.

74. Defendant reviewed the option of other ways to monetize the pension surplus. The company's treasurer, Mr. Chase, also considered terminating the pension plan, transferring the surplus and using the excess assets to establish an employee stock ownership plan. According to Mr. Beebe, the pension surplus also would have made the company an attractive merger candidate.

75. An overfunded plan may also have value in the merger and acquisition context. A target company may be more attractive to a purchaser because it has an overfunded pension plan. An overfunded plan is an asset of the target company.

76. In the case of the merger or acquisition of MDC by Boeing Corporation, it was not necessary to merge the pension plans in order to realize the value in MDC's plan. Overfunded plans such as MDC's generate net income which favorably impacts the balance sheet. The overfunded plan stands as an asset and a potential source of income in its own right. From Boeing's standpoint, it is desirable to acquire an overfunded plan like MDC's, which was generating net income.

77. Mr. Allen testified that if MDC had recaptured the overfunding, it would have had to pay significant federal and state taxes.

#### vi. *Recapture of the Tulsa Surplus*

78. In addition to the $24.7 million in pension and medical savings the company would reap from closing Tulsa, the company stood to recapture the pension surplus from the Tulsa segment of its business. In closing the Tulsa plant, MDC recaptured pension fund assets in excess of $11 million.

79. The Federal Acquisition Regulations ("FAR") contain a provision that required MDC to "promptly notify the Contracting Officer in writing when it determines that it will terminate a defined benefit plan or otherwise recapture such pension fund assets." FAR 52.215–27. Defendant failed to notify promptly the United States Government that it had recaptured the Tulsa pension surplus through closing that segment of its business.

80. As early as 1992, MDC opposed the government's position that it should, on the basis of past contributions it made to funding MDC's pension plans, receive an equitable share of the recapture of excess pension plan assets. MDC's opposition policy was circulated to the contract administration at Tulsa and it warned employees not to sign any government contract containing such a sharing provision, so as not to jeopardize the company-wide policy that the surplus was owned solely by the company.

81. More specifically, since at least 1992, MDC's government contracting department was aware that the government was claiming a share of pension surplus arising from a "segment closing" of its business, like the closing of its Tulsa segment.

82. It was not until January 11, 1996, after the Defense Contract Audit Agency raised the issue concerning the Tulsa pension surplus, that MDC provided the government with its segment accounting. Documents prepared by Ernst & Young in conjunction with the audit show that MDC reaped a $25 million ($15 million salaried and $10 million hourly) pension surplus when it closed Tulsa. Mr. Beebe testified that MDC's segment accounting showed that the actuarial asset value of the benefits was $33,199,000 as of November 11, 1994. As of that date, the Tulsa asset was combined with the assets of another segment of the company known as McAir. The liability associated with the $33 million asset was also transferred, amounting to $22 million resulting in a pension surplus of over $11 million.

### vii. *Closing the Tulsa Plant*

83. As described above, in 1993 MDC initiated "Project M."

84. Richard Smoski, as the MDC executive in charge of its pension plans, periodically received data on the pension gains from the reductions in force. It was not uncommon for Mr. Smoski to be instructed by MDA–East's Chief Financial Officer, William Austin, to calculate the impact of a plant closing, particularly whether there would be costs, a change in funding or a drop in earnings. Mr. Austin was a Project M team member.

85. While MDC claimed it never took the demographics of the plants into account, the "Project M Out Brief" on the Florida Missile Plant in Titusville, Florida listed "demographics" as one of the study's significant considerations.

86. MDC claimed it examined all kinds of costs and benefits in its Project M analysis, including: (a) the cost of deactivating the plant and returning it to its original state; (b) the costs of any write-offs associated with any excess equipment, under-appreciated building improvements, and/or excess inventories; (c) the cost of moving equipment, tooling work in process, inventories, and selected employees to new work sites; (d) the costs associated with rearrangements at new work sites; (e) the costs associated with the disruption of the production lines; (f) the impact on total costs and on labor and overhead rates at the new work sites; and (g) the impact of any incentives associated with the movement of work such as state tax incentives or union concessions related to wage rates and job classifications.

87. While studying nearly every conceivable type of cost attributable to Tulsa, Project M analyst Mark Meyerhoff, who reported to Laurette Koellner, the head of Overhead Rates and Budgets, denied that he had looked at personnel costs associated with the plant closing such as accelerated pension effects, testifying under oath that he "never thought about it." Meyerhoff Dep.Tr. 52.

88. However, several Project M documents called for the pension costs to be evaluated along with each of the other kinds of costs Mr. Meyerhoff admitted to evaluating. Defendant's outside actuaries Alexander & Alexander and Ernst & Young had told MDC that it would maximize its overfunded pension plans by focusing on plants with more senior and older workers. Much of that correspondence was directed to Richard Smoski, MDC's director of pensions.

89. Contrary to Mr. Meyerhoff's testimony, his Project M meeting notes state that he was directed by the Project M Team to contact Mr. Smoski about the Tulsa plant closing's effect on pension cost savings. Mr. Meyerhoff's meeting notes of September 10, 1993, reflect the following: " * (2) call Rich Smoski (Pension benefits) effect on cost/earnings?" Pl.Tr.Ex. 58.

90. Mr. Juliano's "Option Analysis" states that it "will be used as a decision-making aid for consolidation of McDonnell Douglas facilities," in particular "considerations for the potential closure of the Tulsa, Oklahoma, facility." Pltfs.Tr.Ex. 62. In the financial section is a page dated September 20, 1993 (within ten days of the date of Mr. Meyerhoff's notes) stating (§ 5.2.5) that the financial analysis of the effect of closing Tulsa will include a pension analysis:

> This category shows an estimate of the potential out-of-the-ordinary personnel related costs of closing the facility. *An estimate will be prepared of severance liabilities for the FEP or CBU employees and accelerated pension effects.*

Pltfs.Tr.Ex. 62, M152 002 0290 (emphasis added). A later version of the "Project M Option Analysis," dated November 10, 1993, contains identical language calling for the same pension analysis to be performed.

### C. *Defendant's Claimed Basis for Its Decision*

91. At trial, MDC made two affirmative claims as to its reasons for closing Tulsa. First, it contended—as it had throughout the pretrial phase of the case—that pension considerations played *no* part in its decision. Second, it advanced as the sole reason for closing the contention that it closed the Tulsa plant for excess capacity reasons based upon economic and financial considerations presented to Mr. Capellupo by members of the Project M Team at a meeting on October 22, 1993.

92. Following the trial, MDC has argued that certain evidence established that Tulsa was the logical candidate for closing, including the following:

- MDC's financial condition was serious;
- Overcapacity was a problem throughout MDA–East;
- No single product was produced completely by Tulsa and only at Tulsa;
- MDC had tried to give Tulsa an anchor product line with the A–12, but that effort was unsuccessful;
- Three plants had been closed before Tulsa;
- St. Louis was not a realistic selection for closure;
- The Mesa plant was designed strictly for helicopter manufacturing, and MDC had almost one-quarter billion dollars invested in the building;
- The Titusville plant was competing for a winner-take-all contract to build the Tomahawk cruise missile, and closing Titusville before that contract was awarded would have severely damaged MDC's chances of winning that contract; and
- Tulsa was a leased facility. The federal government was undertaking to rid itself of such GOCO facilities.

### i. *Record of Corporate Dishonesty*

93. At trial, Plaintiffs contended that MDC's stated reasons for closing Tulsa lacked credibility in part because they were embedded in a culture of corporate dishonesty. In addition to being dishonest about the reasons for the plant closure, MDC misrepresented to its work force, Oklahoma's political leadership, and the public that it would remain open for three to five years if the Saudi contract were approved. Based on the evidence at trial, the Court concluded that a culture of dishonesty existed at the company and referred to testimony that "in some places is almost knee buckling in the way in which it evidences an abject disregard for people's representations to their employees, their 'teammates,' people's representations to the public and people's representations to public officials." Tr. 1143.

94. As set forth in the background facts above, MDC repeatedly represented that the fate of the Tulsa plant was directly tied to the success of the Saudi F–15 contract. On numerous occasions, Defendant represented that if the contract was won the company would operate the plant for at least three more years.

95. According to Baxter Tate, the company's expert on government contracts and pricing, these representations were not true when they were made. Mr. Tate testified that during 1992, while Defendant was soliciting worker lobbying efforts in support of the Saudi F–15 contract by promising to assign the F–15 work to Tulsa and therefore keep the plant open for at least 3 years if the contract was approved, it had already decided that in fact the Saudi contract was not enough. In addition, Tulsa would have to receive both the F/A–18 modification contract and component work to stay open. These additional contingencies were never disclosed to the work force; to the contrary, employees were told over and over that if they helped MDC get the F–15, and it did, their jobs would be secure.

96. MDC kept its plans regarding the plant closing secret from its Tulsa plant manager, Don Bittle. At trial, Mr. Bittle testified that in retrospect the statements that Tulsa would stay open to do the F–15 work were untrue when made. He also testified that he had been kept in the dark by his superiors in St. Louis, and thus knew nothing about the Executive Council's decision that in fact Tulsa would close unless the F/A–18, as well as additional component work, was obtained. Mr. Bittle also testified it was misleading to tell someone that if the F–15 contract was not won by the company, it would have to close the plant, without saying at the same time that the contract does not guarantee anything, unless additional work was obtained.

97. At trial, the Court inquired about why the company would keep a general manager in the dark about business issues where thousands of jobs were at stake:

THE COURT: I'm having some difficulty understanding how a business decision can be made without the person responsible for the business at least getting a presentation opportunity to demonstrate why the business should be maintained.

MR. BITTLE: The best I can explain to, Your Honor, is that we report to the Vice President of Production Operations in his St. Louis, which was Al Briggs and then later Pete Juliano. So it was my belief that any presentation on behalf of Tulsa would have been made by that organization to the people in St. Louis. I was not involved in that, I think, for one probably specific reason. If I did not have the knowledge that these studies were at this extent of going on, then if I were asked by the press or somewhere about a rumored shutdown of Tulsa I would not have the latest knowledge what was going on in Tulsa as to what the extent of that study was....

THE COURT: So you were told then that in fact you were not informed because they wanted to make sure that nobody—that you could answer truthfully nobody knew; right?

MR. BITTLE: That's correct.

THE COURT: So in fact when you say whether or not there was an intentional effort to maintain a silence in order to maintain what turned out to be a false appearance, then you are telling me in fact there was such an intentional effort; right? You were told that.

MR. BITTLE: Uh-huh.

Tr. 297–300. Mr. Bittle also acknowledged that management in St. Louis was "knowing and witting of the false representations he was giving." Tr. 317.

98. Furthermore, Mr. Bittle gave the following testimony at trial:

THE COURT: Do you think, looking back on it, sir, that you were an instrument of misrepresentations, both to the work force and to the community of Tulsa?

MR. BITTLE: That I was a misrepresentation?

THE COURT: That you were an instrument of misrepresentation.

THE WITNESS: Looking back on it, yes, I can see that that would be the deduction made, yes.

Tr. 301.

99. MDC also engaged in sham negotiations with the City of Tulsa and the United States Government over the lease of the Tulsa facility. Specifically, Peter Juliano, who headed the Project M Team, admitted at trial that MDC had short-circuited the lease negotiations in bad faith.

100. Mr. Juliano gave the following testimony at trial:

THE COURT: Is it fair to say, under those circumstances and his conduct in accordance with your instructions that that was not a quote "good faith negotiation," when somebody is told whatever you do, you can't enter into—you keep saying relationship, what you mean is a legally binding agreement; right?

THE WITNESS: Correct.

THE WITNESS: Correct, correct.

THE COURT: So if you can't—if you enter into negotiations but in fact you can't agree, is that a good faith negotiation?

THE WITNESS: Sir, I don't know as a matter of law. I would assume so.

THE COURT: I'm just saying from your standpoint. You're a businessman?

THE WITNESS: Yes, sir.

THE COURT: If you entered into something and you found out later they had no authority, in fact they were expressly told they couldn't enter an agreement with you, but you had been sitting there talking about price and conditions and terms, would you consider that you had been involved in a good faith negotiation?

THE WITNESS: Probably not.

THE COURT: Probably not. I mean, do you think the mayor was wrong when she characterized those as good faith negotiations? She didn't know it.

THE WITNESS: Yes.

THE COURT: But she was wrong?

THE WITNESS: Right.

Tr. 929–931.

101. Within days of the December 3, 1993 announcement of the Tulsa plant closing, representatives of the state of Oklahoma, the City of Tulsa and the impacted unions sought to remind Chairman McDonnell of the efforts they had undertaken to win the F–15 contract. Mayor Savage stated in her December 13, 1993 correspondence to the Chairman, "UAW President Owen Bieber" along with the community and elected officials "provided their combined full political support to assist the company in obtaining new F–15 work at the end of the Bush administration." Pltfs.Tr.Ex. 90 at M152 002 0146. The Mayor concluded that "because of the previous concessions of UAW Local 1093, and the efforts of all with regard to the F–15, Tulsa deserves to have the F–15 work performed in Tulsa." *Id.* at M152 002 0147.

102. MDC was aware of the substantial contribution made by the Oklahoma delegation to the company's F–15 campaign. Indeed, Defendant's Project M documents indicate that if its attempt to "weave a corporate-wide strategy" to escape its promises failed it might be "politically required" to leave the F–15 work in Tulsa with a small disadvantaged business subcontractor

103. The Department of Defense and its officials are direct customers of MDC. Congress is also viewed as an important piece of the puzzle because it appropriates the funds for the Defense Department's budget. In 1993, there were 45 to 50 persons working in the company's Washington offices, with six to eight performing the functions of congressional liaison. Chairman McDonnell was generally MDC's final spokesperson, vis-a-vis Congress and the Department of Defense. Chairman McDonnell testified at trial that he did not believe he ever made an assessment of the nature and content of the communications that were made to the Oklahoma political delegation to determine whether MDC had made express representations inconsistent with closing the Tulsa facility.

104. Chairman McDonnell recalled meeting with the Mayor of Tulsa and seeing her letter, in which she expressed the belief that she was having a productive lease negotiation with MDC when the announcement to close the plant was made. He admitted that it was "probably not good judgment" to have entered into negotiations without informing the City that in fact the company's representatives were instructed to avoid making any agreements. Mr. McDonnell also admitted receiving the newspaper articles containing Mr. Bittle's statements that there would be a long-term relationship between MDC and Tulsa. Mr. McDonnell conceded that management should have told Mr. Bittle

not to make such statements. As for his own role, the Chairman admitted that while he was ultimately responsible for approving the closure of the Tulsa plant, he never considered whether or not the community, public officials, or MDC's own employees believed that they had been led to a conclusion that there was a long-term relationship with the company following the approval of the Saudi F–15 contract.

### ii. *Claim that Pension Considerations Played No Part*

105. In its opening statement, MDC took the position that an "element of cost ... that was not considered in the decision to close Tulsa was the cost of employee pensions." Tr. 22. According to MDC, it had grossly overfunded pension plans and used zero dollar pension costs in all of its operational and budget planning, including Project M.

106. It was true that MDC pension plans were overfunded. The evidence showed, however, that MDC was committed to maximizing the surplus and monetizing it for the company's own benefit. MDC monitored the surplus and the gains from the layoffs on a monthly basis. MDC was being advised how the age and service demographics of older segments of the work force with greater service could greatly increase the surplus when compared with a younger-shorter service segments of the workforce.

107. Mr. Meyerhoff testified that pension cost savings were not factored into the company's financial analysis of the plant closing. The Court finds that this testimony is not credible.

108. There is evidence showing that pensions were valued in the financial analysis contrary to Defendant's claim at trial. Mr. Meyerhoff signed an affidavit on October 23, 1998 which was filed in response to the Court's request at summary judgment

for the precipitating documents. Mr. Meyerhoff's affidavit stated that in preparing the financial analyses "he reviewed and analyzed the elements of expense savings listed on the pages M152 003 0604–0610," contained in Defendant's Trial Exhibit 19. One of the cost items listed in Defendant's Trial Exhibit 19 called for an accounting of the accelerated pension benefits effect from the plant closing. When asked whether he provided Mr. Juliano with the pension study called for in Defendant's Trial Exhibit 19, Mr. Meyerhoff responded: "If it's something I could have given him on any of those pages, I might have given it to him. I did not ever give him anything with respect to accelerated pension benefits." Tr. 470–471. Mr. Meyerhoff's answer is contradicted by his affidavit in which he said he "analyzed the elements of expense and savings listed" in Trial Exhibit 19. Even though Mr. Meyerhoff denied performing the calculation, he admitted knowing that an accelerated pension effect could occur when employees were laid off. Further, he testified that there could well be an accelerated pension effect, even when his other calculations included pension as a zero in his overhead studies of the plant closing.

109. Mr. Meyerhoff's Project M team notes reflect that he was instructed who to contact to determine the pension benefit effect of the plant closing on cost/earnings. This person was Rich Smoski who, in addition to being in charge of pension and payrolls, had been the contact person for the outside actuarial reports on maximizing the pension surplus through the demographics of the plant or segment of the population selected for lay off. Mr. Meyerhoff claims he never made contact with Mr. Smoski. However, in light of the emphasis the company placed on tracking the pension surplus, the fact that the Project M team's own documents called for the pension analysis, Mr. Meyerhoff's October 23, 1998 affidavit in which he states he

performed the analysis, and his notes directing him to contact Mr. Smoski, the Court finds that Mr. Meyerhoff's testimony in this regard is not credible. As discussed next, Mr. Meyerhoff's credibility is further diminished by his testimony with respect to the financial analysis the company performed concerning the two options it reviewed for closing the Tulsa facility.

### iii. *Affirmative Reasons Advanced by Defendant are not Credible*

110. Defendant's second contention was that its sole reason for closing the plant was the alleged non-pension and benefit savings. According to the trial testimony, on October 22, 1993, Peter Juliano and William Austin met with John Capellupo to discuss closing MDC's Tulsa plant. At that meeting, Mr. Juliano handed Mr. Capellupo Defendant's Trial Exhibit 28, a seven page summary presenting two options for closing the Tulsa plant. Option 1 was to close the Tulsa plant and shift the F–15 AFT fuselage work to St. Louis, and Option 2 would leave that work in Tulsa with a "small disadvantaged business" contractor. Page six of the summary, captioned "Cost Impacts," was blank.

111. Mr. Austin, who presented the financial aspects of Project M at the Capellupo briefing, testified that he carried the financial analysis of Option 1 to the meeting. Mr. Austin testified that in sensitive projects, like Project M, the company did not want the financial information widely dispersed within the company. According to Mr. Austin, he wanted the cost impacts to be run by his staff, without outside influence from any other part of MDC. For those reasons, he did not release a copy of the cost impacts, but instead carried that with him to the Capellupo briefing.

112. According to Mr. Austin, at the October 22, 1993 Capellupo briefing, he

was asked no questions concerning Option 2 of Defendant's Trial Exhibit 28.

113. Mr. Austin presented Mr. Capellupo with Exhibit 88, a one-page document titled "MDA–East Consolidation Project, Impact on Programs," which only addressed the briefing memo's Option 1. Mr. Capellupo turned to Mr. Austin and asked: "Is this a good business deal?" Mr. Austin stated, "[T]his is a good business deal." Tr. 918.

114. Mr. Austin and Mr. Juliano each testified that he had no reason to believe that any financial analysis used during the October 22, 1993, briefing, or relied upon in the decision to close Tulsa, was destroyed. Mr. Meyerhoff testified that, during the course of discovery, he turned over every document in his possession related to Project M. Mr. Meyerhoff further testified that while he destroyed some Project M documents in the normal course of business, he destroyed no significant financial analysis related to Project M, was never asked to destroy any such documents, and had no reason to believe that any such analysis had been destroyed by anyone else at MDC. Ms. Koellner likewise testified that she did not destroy any financial analysis related to Project M, and was unaware of the destruction of any such an analysis.

115. Other witnesses were not sure whether the seven page summary and the one-page supplement were the documents presented at the meeting. Mr. Capellupo testified that he does not remember what documents he was given. On cross examination, Mr. Tate, who testified he was at the meeting with Mr. Capellupo, backed away from his earlier identification of Exhibit 88, stating that he did not see the document Mr. Austin held. Mr. Juliano stated he was not given a copy of the financial information at the meeting, and on cross-examination testified that he did not hand the financial information to Mr. Capellupo, as Mr. Austin had only one copy of the document.

116. Mr. Juliano testified that no document containing a financial analysis of Option 2 of Defendant's Trial Exhibit 28 was in the briefing of October 22, 1993. Mr. Juliano further testified that Mr. Austin brought to the meeting a single sheet of paper, Defendant's Trial Exhibit 88. Mr. Austin testified that he took only Defendant's Trial Exhibit 88 to the meeting.

117. As for the seven page summary, Exhibit 28, Mr. Juliano insisted during cross-examination that he was certain it was the precipitating document he took into the meeting and presented to Mr. Capellupo. However, that testimony is completely inconsistent with his deposition testimony, where he said he had "no idea" whether the document was the final summary of the recommendation Project M presented to Mr. Capellupo.

118. MDC did not even include either Defendant's Trial Exhibit 88 or Exhibit 28 in its initial summary judgment filing, relying instead on Defendant's Trial Exhibit 21. It was only when the Court required a complete copy of the comprehensive Project M report that the Exhibits 28 and 88 explanation was offered by a letter to the Court dated October 9, 1998.

119. Rather than relying on Exhibits 28 or 88 on summary judgment, MDC instead appended to its summary judgment papers a one-page undated, unsigned summary analysis which, in an accompanying affidavit, Mr. Juliano averred was the financial basis of the decision to close Tulsa. The document (later identified as Defendant's Trial Exhibit 21) is a five-year projection (1993–97) that shows an ultimate $20–million–plus gain from closing Tulsa

120. When John Capellupo, the primary decision maker, was deposed, he

could not recall seeing this summary analysis. Indeed, he testified that he saw it for the first time in preparing for his deposition. Mr. Capellupo further testified that the one-page summary analysis advanced by Mr. Juliano as the basis for the Tulsa closing decision would not have provided him with sufficient detail to decide the closing issue. Mr. Capellupo stated, "You need more information than this. You just can't make a decision with this—on this basis." Capellupo Dep.Tr. 116–117. He said that the summary financial analysis also contained calculations that he could not explain and which appeared to be erroneous.

121. When the company shifted to Defendant's Trial Exhibits 28 and 88 as the documents upon which the decision was based, the problems with this revised explanation were readily apparent. For one, Exhibit 88 does not fit in any way with Exhibit 28, the seven-page report it supposedly complements. The evidence shows that if Exhibit 28 was in fact the basic document, it would have contained the financial information necessary for Mr. Capellupo to make his decision.

122. Mr. Capellupo recognized at trial that it was unusual for the final executive summary to have a blank page where the financial analysis should be. When asked whether Exhibit 28 was the same type of document he would have expected to receive, he said that it was "with the exception of the blank page." Tr. 972. Later, in response to the Court's inquiry, Mr. Capellupo testified that the financial analysis would normally be included in the executive summary. He stated "I would have thought the piece would have—would have been in there even though Pete didn't put it together." Tr. 1060.

123. Defendant's claim that it was necessary for the Cost Impact page to be blank to keep the financial information secure is refuted by the fact that there was no "MDC–Private" stamp or other confidentiality marking on Exhibit 88. Additionally, Exhibit 88's bottom line number was already disclosed on the final page of Exhibit 28, the executive summary. As Mr. Capellupo testified at his deposition, Mr. Juliano would have been expected to review the financial information before it was presented it to Mr. Capellupo. Thus, there was no reason to keep the financial analysis private from Mr. Juliano.

124. Mr. Meyerhoff testified that he did not prepare a detailed financial analysis of the Option 2 in Defendant's Trial Exhibit 28, similar to the format and detail shown in Defendant's Exhibit Trial 88, which is the financial analysis of the Option 1 in Defendant's Exhibit 28.

125. Mr. Meyerhoff testified that he was never asked to, and did not, prepare a detailed financial analysis of Option 2, and that no one else at MDC would have prepared such a document for Project M. He further testified that he prepared no document, other than Defendant's Trial Exhibit 88, which he understood was to be used in the Capellupo briefing on Project M.

126. The hole created by the blank financial page in Exhibit 28 is not filled by Exhibit 88. Exhibit 28, the Summary and Recommendation, references two cost options, but Exhibit 88 addresses only the financial impact of Option One. The Court finds, as stated at trial:

> Mr. Meyerhoff's testimony that in some way Exhibit 88 is meant to be inserted there simply is not credible. It is putting a round peg in square hole. We know what is in 67–N in its entirety. We know it has different alternatives. We know that Mr. Meyerhoff is tasked with developing all manner of financial alternatives, and to say that a piece of that financial analysis is meant to carry the burden of the cost impacts for a report that carries two alternatives, sim-

ply is inconsistent with the balance of his testimony about his role and about his responsibility and about the detailed financial examination that was performed in connection with this decision.... But within that wide latitude the company must evidence that in fact the business judgment rule should be upheld by demonstrating that it has relied upon comprehensive business data. The failure of that exhibit, the continuing failure of that exhibit and the suggestion that it's really Exhibit 88, in my judgment, does not entitle the broad application to the business judgment rule.

Tr. 615–16.

127. The testimony established that the person ultimately responsible for presenting complete and accurate information was William Austin. Laurette Koellner reported to Mr. Austin and supervised Mr. Meyerhoff's Project M work. She testified that she briefed Mr. Austin only on Option 1 prior to meeting with Mr. Capellupo. Ms. Koellner had never heard of Option 2, which would leave the F–15 AFT fuselage in Tulsa, until she began to prepare for trial.

128. According to Mr. Capellupo, it was inconceivable that if there were two cost options under consideration, Mr. Austin would be unprepared to talk about them both. As Mr. Capellupo said, "I would be absolutely amazed if that happened." Tr. 1056. It was also entirely inconsistent with Mr. Capellupo's experience at McDonnell Douglas that Mr. Meyerhoff would be providing numbers on Option 2 to others in the company, but not telling Mr. Austin and Ms. Koellner about the second option.

129. Given that Exhibit 88 did not address Option 2, and Mr. Austin was not prepared to discuss Option 2, either there was an additional analysis at the meeting or Mr. Austin went into the Capellupo

briefing unprepared. Mr. Juliano testified that Mr. Capellupo's employees were unlikely to approach him unprepared, and, in fact, in the fifty-odd meetings he had attended with Mr. Capellupo and Mr. Austin, Mr. Austin had *never* been unprepared. The Court finds that it is simply not credible to believe the Exhibit 88 explanation, that Mr. Austin did something that he never did before or since. The Court further finds that it is not credible to believe that the MDC employees charged with studying the Tulsa issue forgot to include half of the financial data in their final report, and that no one in the financial chain of command—not Mr. Meyerhoff, not Ms. Koellner, not Mr. Tate, not Mr. Austin, not even Mr. Capellupo—noticed this vital omission.

130. The Court finds that there is simply nothing about Mr. Capellupo's recollection of the financial data he testified that he considered supports Defendant's claim that Exhibits 28 and 88 are the actual documents upon which the final decision was based. Defendant's Exhibit 88 varies significantly from Mr. Capellupo's deposition testimony that he would have considered the cost of closing the plant, the cost of moving the manufacturing from Tulsa, and the cost of producing what Tulsa manufactured after the work was relocated. Mr. Capellupo recalled the financial data showed "that the pay back was reasonably short, like a year or two," not the three year payback forecast in Exhibit 88.

131. At trial, MDC advanced its claimed basis for the decision to close Tulsa through Peter Juliano. The Court finds that the testimony of Mr. Juliano in this regard is not credible. No other MDC witness could credibly corroborate Mr. Juliano's Option–2 explanation. Mr. Capellupo could not recall the documents. Ms. Koellner repeatedly denied knowledge of *any* Option 2 financial analysis. Mr. Mey-

erhoff, who directly contradicted his own sworn statements made in his earlier-filed affidavit, was not credible.

132. Mr. Juliano contended that if Mr. Capellupo had wanted to see the data on Option 2 they could have had Mr. Meyerhoff bring it to the meeting. This testimony is not credible for a number of reasons, chief of which Mr. Meyerhoff had never attended a meeting with Mr. Capellupo in his entire career.

133. It is unclear why Mr. Juliano, who was not qualified to present the financial analysis of Option 1, would have handled the financial impact of Option 2 rather than William Austin. According to Mr. Capellupo, this made no sense, for even if Mr. Juliano originated Option 2, Mr. Capellupo "would have turned to Bill Austin and asked him have you developed these numbers? Can you vouch for these as being the accurate numbers?" Tr. 1059–1060. Mr. Capellupo admitted he had to rely on Mr. Austin, "[b]ecause Pete did not have the wherewithal, nor was he in the right organizational position to do that." Tr. 1060. In sum, while the company relied heavily on Mr. Juliano to establish how its trial Exhibits 28 and 88 fit together, there is nothing in his story that is worthy of belief.

134. By the end of the trial, the conflicting testimony concerning MDC's claimed business justification for closing its Tulsa facility left the Court with questions about whether the Defendant destroyed or suppressed documents which reflected the financial basis for closing the Tulsa facility. The Court directed the parties to brief the issue of whether MDC destroyed documents.

### D. *Evidentiary Hearing on Spoliation*

135. On May 2, 2000, having reviewed the parties' submissions on the issue of spoliation, the Court determined that it was necessary to develop additional infor-

mation and ordered the Defendant to locate and produce "any and all documents that reflect in any way, the information submitted to the United States Government with respect to the closing of the Tulsa plant ..." and "all documents that reflect, in any way, information developed by Mark Meyerhoff with respect to Option 2 ...." 05/02/00 Order.

136. Over a span of eight weeks, MDC filed six (6) reports on its efforts to locate the documents requested by the Court's May 2, 2000, Order. According to these reports, counsel for MDC and MDC personnel contacted and/or attempted to contact certain individuals who might have had knowledge of the location of the documents furnished to the government, and which the Court ordered produced. In addition, MDC re-examined certain internal files in search of this original Truth In Negotiations Act ("TINA") disclosure document, which MDC identified as bearing the designation of DISCL–010–026 and dated December 3, 1993.

137. Notwithstanding the direct orders of the Court, MDC never produced the TINA disclosure document actually submitted to the government, DISCL–010–026, as a stand-alone disclosure.

138. Furthermore, after the Court directed the parties to brief the spoliation issue, Defendant identified William Austin, MDA–East's Chief Financial Officer as a potential witness.

139. The Court stressed the importance of MDC making every effort to have Mr. Austin and the other witnesses testify in person. As the Court stated, the extraordinary testimony at trial compelled the conclusion of any objective observer that the credibility of MDC's witnesses was very low and the Court had a right to discount their credibility, because they had intentionally mislead people in negotiations and engaged in dishonest conduct. In that

context, it was in "the highest interest ... on the part of the defendant to avail itself of this opportunity to come full bore on this issue." 09/16/99 Tr. 8–11. Notwithstanding these admonishments, Defendant failed to take even the most basic step of informing Mr. Austin of the Court's accommodations in the proposed schedule for the spoliation hearing.

140. At Mr. Austin's deposition in Houston, Texas on October 2, 1999, he was asked about a September 10, 1999 letter in which the company sought his deposition, but failed to make any request that he testify in person at the hearing before the Court in Tulsa, Oklahoma:

Q. Now, this letter tells you that the parties wanted to take your deposition; is that correct?

A. It does.

Q. Did you ever have knowledge that the federal district court judge in this case, Judge Holmes, had set aside September 30th for a hearing in this matter in Oklahoma for you and other witnesses to appear to give testimony?

A. I did not.

Q. Did you ever learn that the judge canceled that hearing for September 30th and sought to provide you a time to appear in Oklahoma during the month of October?

A. I did not.

Q. Have you been asked as to your availability to attend a hearing in Oklahoma in November?

A. I have not.

Austin Dep.Tr. 47–48.

141. Peter Juliano also failed to appear at the November 18 hearing. Like Mr. Austin, Mr. Juliano claimed that he would come to Tulsa to testify, stating, "Yes, if that's what's required, I would do it, but I did not refuse." 10/19/99 Juliano Dep.Tr. 28. Rather than communicate that it was required, MDC gave Mr. Juliano the option of whether he would like to return for the hearing or merely give a deposition. Mr. Juliano and Mr. Austin are key witnesses with respect to determining whether all material financial documents have been produced. Defendant produced all its witnesses at trial, so its failure, at the very least, to tell its former employees their presence at the spoliation hearing was expected and desired by the Court raises serious questions about their credibility.

142. One of the questions left unanswered at trial was how Mr. Austin could have been prepared to brief Mr. Capellupo on Option 2 when neither Ms. Koellner nor Mr. Meyerhoff knew such an option would be covered at the briefing. The Court addressed this very point when it first raised the question of spoliation:

But the first order of business, based upon that document [Def's.Tr.Ex. 28] and knowing the role that that document played and knowing the articulated basis for this closure was the financial effect, and that the cost-impact is missing, and that there is no basis upon which to credit Mr. Meyerhoff that in fact Exhibit 88 is meant to be the surrogate for the costs-impact statement, because it only addresses one option, and it is fundamentally at odds with everything that Mr. Capellupo knows about that company, and everything that Mr. Austin runs through his shop, and Mr. Juliano himself testified that he has never been in a meeting where they turned to Mr. Austin and said "Tell us about the financials" and he said "I don't know." The idea that he would go into that meeting unprepared to address the option two, that there was some financial break out, drives the notion that it is appropriate to

address the question of whether this is a case of spoliation of evidence. Tr. 1141.

143. At trial, none of MDC's witnesses testified that they briefed Mr. Austin on Option 2 or even told him it would be covered at the Capellupo meeting. In fact, Ms. Koellner and Mr. Meyerhoff testified they did not have any knowledge that Option 2 would be on the agenda. The Court finds that there is no credible evidence that Mr. Austin—the person responsible for presenting the financial analysis to Mr. Capellupo—knew that Option 2 would be addressed at the meeting.

144. In his affidavit, Mr. Austin claimed that he "was *prepared* to argue with John Capellupo that Option 2 did not make good financial and business sense for the company." Misc.Ex. 3, Austin Aff. ¶ 10 (emphasis added). This claim is based upon mere speculation. Mr. Austin admitted at his deposition under cross-examination that he was not sure he was given any forewarning that Option 2 would be covered in the Capellupo briefing memo. If Mr. Austin did not know that Mr. Capellupo was going to be briefed on Option 2, he would not have been prepared to brief it. Because Mr. Austin did not know Option 2 would be an agenda item, he was in virtually the same position as Ms. Koellner (Boeing's present Controller and former Austin report), who testified that she did not know that an Option 2 would be presented to Mr. Capellupo.

145. On cross-examination, Mr. Austin at first said that he thought he learned that Mr. Juliano wanted to show Option 2 to Mr. Capellupo "shortly before the meeting." Austin Dep.Tr. 70. But Mr. Austin testified that he cannot recall how he learned this. Mr. Austin stated he didn't know if it was Mr. Juliano who told him, and then admitted, "I don't know." · *Id.* at 70. Mr. Juliano could not recall such a conversation with Mr. Austin, and both Ms. Koellner and Mr. Meyerhoff testified they had no knowledge that Option 2 would be covered.

146. Mr. Austin went on to testify that while he knew Option 2 had been costed out: "I'm not sure I knew that he [Mr. Juliano] actually was going to put that on the last page." Austin Dep.Tr. 70–71. If Mr. Austin did not know he was responsible for briefing Mr. Capellupo on Option 2, then the claim that he repeatedly makes in his affidavit concerning his advance "preparation" to address this alternative is simply not credible.

147. The SDB exhibits at issue—Defendant's Trial Exhibits 67 Q, R, S, V and W—establish that if Mr. Austin was to compare the two financial options it would have been necessary to have these exhibits present. Exhibit 67 S compares the effect of each of the two options on various program costs, such as the F–15. There is no way Mr. Austin could have intelligently discussed the comparison without having the exhibit present, any more than he could have presented the cost-impact of Option 1 of the company's programs without having Exhibit 88 in hand.

148. Mr. Austin's testimony is also contradicted by the testimony of Ms. Koellner on the fundamental question of who briefed him on Exhibit 88. Mr. Austin claimed in his affidavit that he worked "mainly" with Mark Meyerhoff concerning Option 1. But again, when Mr. Austin was pressed, he admitted Ms. Koellner could have been present for the briefing but he had no particular memory of the events. Mr. Austin's assertion of working "mainly" with Mark Meyerhoff on Options 1 and 2 directly contradicts the trial testimony of both Ms. Koellner and Mr. Meyerhoff. It further shows that his memory with respect to Exhibit 88 is not credible.

149. Both Ms. Koellner and Mr. Meyerhoff agreed at trial it was Mr. Meyerhoff

who presented Ms. Koellner with the Option I analysis and it was Ms. Koellner who briefed Mr. Austin. As for Mr. Meyerhoff, he could not recall any Project M meetings with Mr. Austin when asked at his deposition. The Court had an opportunity to observe Ms. Koellner testify at trial and the post-trial hearing and it found Ms. Koellner credibly testified she was the person who prepared Mr. Austin for the Capellupo briefing and not "wrong in her testimony" as Defendant's counsel would later contend.

150. At the November 18, 1999 evidentiary hearing on spoliation, MDC called Mr. Meyerhoff, who prepared the financial analysis for Project M and reported directly to Ms. Koellner. At this point, Mr. Meyerhoff claimed for the first time that Defendant's exhibits 67 Q, S, V and W, concerning a small disadvantaged business option, would have been shared with Mr. Austin before any bottom line number was discussed with Mr. Juliano. Mr. Meyerhoff, however, could not recall "the exact meeting when" the 67 series exhibits were shared with Mr. Austin and on cross examination he admitted he had no specific recollection of ever handing Mr. Austin any of the 67 series exhibits.

151. At the post-trial hearing Mr. Meyerhoff also made another new claim: that he met with Mr. Austin on a regular basis because Mr. Austin "was accustomed to go right to the source." 11/18/99 Tr. 23. This testimony contradicted both Mr. Meyerhoff's deposition testimony, in which he could not recall any meetings with Mr. Austin on Project M, and his trial testimony, where he failed to identify any meetings with Mr. Austin.

152. The Court finds that Mr. Meyerhoff's testimony at the evidentiary hearing that he would share information on a second financial option in the briefing memo with Mr. Austin and Mr. Juliano and never mention it to his direct report, Laurette Koellner, is not credible. The testimony is not consistent with the chain of reporting in evidence at trial. Mr. Meyerhoff testified quite specifically on Option 1, Defendant's Trial Exhibit 88, stating that: "I gave it to my management who is Laurette Koellner or Baxter Tate. They provided it to Bill Austin." Tr. 406.

153. Mr. Meyerhoff admitted in response to questioning from the Court that his boss, Ms. Koellner, would have expected him to provide a hard copy to her of what he provided to Mr. Austin so that she would have a clear and unequivocal understanding of what was being reported up the chain of command. Yet, according to Ms. Koellner's trial testimony, no such hand-off occurred on Option 2, the SDB option, and if Mr. Austin knew about it he never shared it with her.

154. Mr. Meyerhoff's unsubstantiated suggestion that he departed from this established procedure on Option 2 is inconsistent with his own sworn testimony, as well as the testimony of others, and therefore not credible.

155. Similarly, Laurette Koellner's suggestion at the post-trial evidentiary hearing that no one completed the financial analysis of Option 2, the SDB scenario, because it was not a favored option, must also be rejected. The Court finds that the record supports its statement at the post-trial evidentiary hearing that when Ms. Koellner:

> says "I didn't do it the numbers because I didn't think that much of it" ... [that statement] is not consistent with the testimony given in the trial or her record as a financial officer of that company ... particularly when the option itself at issue is one about which is far outside her realm of responsibility. It's politically driven. That's by the 50 plus people in Washington who are working this problem for the executive and legislative

branch, and they are going to be the ones that say "we're into option two country."

11/18/99 Tr. 83.

156. Mr. Meyerhoff's credibility was also severely undercut at the spoliation hearing. Mr. Meyerhoff's contention at trial that community concerns or political considerations mentioned in the Capellupo briefing memo played no role in his financial analysis proved to be untrue. The Court spent considerable time at trial asking Mr. Meyerhoff, the person who created the financial analyses, whether his projections took into account any of the community or political concerns such as the fact that the City of Tulsa was attempting to provide MDC with a maintenance and rent free lease or to account for the representations that were made about the preservation of jobs and the plant. Indeed, Mr. Meyerhoff's testimony at one point appeared to establish that the financial analysis "was going forward ... completely unfettered by whatever public or private statements were being made to this State and to the representatives of this State." Tr. 614.

157. The assumptions controlling Option 2, the "if politically required Small Disadvantaged Business" scenario, show the option was driven by community concerns. Thus, the financial analysis reflected in Defendant's Exhibit 67R assumes that the work would stay in Tulsa and be performed by the former MDC work force at a rent free facility to be provided by the City. Mr. Meyerhoff's refused to identify who provided him with these assumptions. The Court finds that Mr. Meyerhoff's suggestion that he just invented these assumptions is contrary to the record, and therefore not credible.

### E. Conclusion

158. The Court finds that the testimony of Defendant's witnesses as to its claimed basis for closing the Tulsa facility is inconsistent, incomplete, and in many respects not credible. This finding is further supported by Defendant's repeated refusals to fulfill its discovery obligations, including the production of relevant documents and to answer interrogatories fully and truthfully. The Court concludes that Defendant's proffered reasons for the plant closing are incomplete, misleading, and pretextual.

## II. FINDINGS OF FACT: DISCOVERY ABUSE

### A. Facts and Documents Concerning the Capellupo Briefing were not Disclosed in Discovery

159. The specifics concerning the pattern of discovery abuse date back to Defendant's initial Answers to Plaintiffs' Interrogatories and Document Requests, which were signed under oath on behalf of MDC by Project M Team leader Peter Juliano. In discovery, Plaintiffs asked MDC to identify the key meetings, personnel, and documents involved in the decision to close Tulsa. Specifically, on May 9, 1996, Plaintiffs propounded an interrogatory and document request asking MDC for information on the meetings held and the documents that were used in making the decision whether to close the Tulsa plant. The interrogatory also sought the identity of the persons involved in the decision-making process and the subject matter of their conversations. In its interrogatory answers, MDC claimed that it could not identify the meetings leading to the decision to close its Tulsa plant:

> MDC is unable to identify any meetings, discussions, conferences or conversations regarding the Plant closing, other than the December 1, 1993 approval by Capellupo of Juliano's recommendation to close the Tulsa plant, M152 001 1222. Dates of any such meetings can only be

ascertained by review of documents related to the Project M study, or the miscellaneous papers of those involved in the Project M study, and all of those documents have already been furnished to Plaintiffs.

Pltfs.Tr.Ex. 163, Response to Int. 6 at p. 4.

160. MDC did not provide any information whatsoever with respect to the crucial October 22, 1993 Capellupo briefing, the meeting MDC later claimed at trial was the key one in which the Project M team made its final recommendation to close the Tulsa facility. As detailed below, the Court finds MDC deliberately withheld this and other critical information from Plaintiffs.

161. MDC claimed in Answer to Interrogatory Six that the dates of decision-making meetings could be gleaned from a review of the documents. This statement proved illusory, given the evasive and incomplete deposition answers Defendant's witnesses provided Plaintiffs. Defendant identified three persons involved in the decision to close Tulsa: Project M Team leader, Peter Juliano, who reported to Mr. Restelli, who in turn reported to John Capellupo, President of McDonnell Douglas Aerospace. Plaintiffs attempted to elicit MDC's financial and economic reasons for closing the Tulsa plant at their depositions. The three decision makers shared a startling inability to remember details about the decision to close Tulsa. Significantly, no documents could be identified by MDC or its witnesses as the ones upon which Mr. Capellupo relied in the decision-making process.

162. At his first deposition, Mr. Juliano was asked about the October 22, 1993 Summary Briefing Memo (later designated as Defendant's Tr.Ex. 28) containing two options for closing Tulsa. Mr. Juliano claimed that he could not recall whether this memo was one of the final documents used to brief Mr. Capellupo.

163. At trial, Mr. Juliano completely changed his testimony, claiming Defendant's Trial Exhibit 28 was not only the final briefing memo for the October 22, 1993 Capellupo briefing, but that it was prepared for the meeting by his staff and that he personally brought it to the meeting.

164. Defendant never amended its interrogatory answers to identify the October 22, 1993 meeting or Trial Exhibit 28.

165. The Court finds that Mr. Juliano's testimony concerning the Capellupo briefing memo, Defendant's Trial Exhibit 28, is not credible. If one accepts his sworn answers to Plaintiffs' Interrogatories and his sworn deposition testimony, then his trial testimony was demonstrably false. On the other hand, if one accepts his trial testimony, then his sworn interrogatory and deposition answers were false. This irreconcilable discrepancy bears on the ultimate credibility decision the Court is required to make, because at trial Mr. Juliano, as the Project M leader, was the company's key witness with respect to Mr. Capellupo briefing and to Defendant's Trial Exhibit 28. No other witness could corroborate his story. Mr. Capellupo could not recall the document. Laurette Koellner, who prepared William Austin to brief Mr. Capellupo on the financial analysis for the closing, had never seen the briefing memo and did not attend the meeting with Mr. Capellupo. Defendant did not call Mr. Austin, the key financial advisor on the transaction, to testify at trial.

166. Mr. Juliano's testimony about the precipitating documents is not the only instance in which his deposition testimony was diametrically opposed to his testimony at trial. Mr. Juliano also provided sworn deposition testimony that he was not privy to the financial documents, whereas at trial he testified that he was responsible for

preparing the October 22, 1993 final briefing memo for Mr. Capellupo containing two financial options for the Tulsa plant. The record supports the Court's statement at trial that the answer "I'm not privy to the financial statements, is simply not a true statement," because "[h]e was fully privy to every financial aspect of this decision." "Well it is clearly untruthful testimony at his deposition, truly unequivocally." Tr. 1115–1116.

167. The Court further finds untrue the deposition testimony from Project M leader Mr. Juliano with respect to Defendant's political concerns over closing Tulsa. At his deposition, Mr. Juliano was asked about Option 2, the Small Disadvantaged Business Option, presented in the Capellupo executive summary. Mr. Juliano was asked if he knew what the reference in Option 2 "(if politically required)" meant. Mr. Juliano responded, "I can't say why we put that together at this date...." Juliano Dep. 106.

168. Mr. Juliano's deposition testimony that he did not recall what the phrase in Option 2 ("if politically required") meant is also at odds with his trial testimony that the SDB Option, to keep the F–15 work in Tulsa, was developed at his insistence because he felt compelled to present Mr. Capellupo with more than just one option. Mr. Juliano knew Option 2 was necessary to address the political risks which might turn out to be disastrous given the contribution by Oklahoma's political representatives in obtaining the F–15 for MDC.

169. Other Project M documents prepared under Mr. Juliano's name show how aware he was that the Oklahoma delegation might feel betrayed. The October 7, 1993 Project M document lists the members of the Oklahoma delegation and states: "These individuals were all very aggressive in lobbying the Bush administration to approve the sale of F–15's to Saudi Arabia. If they feel as though they

were used just for expediency, they may hold a grudge against McDonnell Douglas as we seek C–17 funding." Pltfs.Tr.Ex. 74.

170. Also, Mr. Juliano's own handwritten notes from a Project M meeting held on October 7, 1993, just two weeks before the Capellupo briefing, included a notation on "Bad Faith." Yet, in his deposition, Mr. Juliano claimed he could not recall any discussions about bad faith.

171. Bill Austin, one of the participants at the same October 8, 1993 meeting, was able to attribute a discussion to Mr. Juliano's fear that MDC might be accused of "bad faith" by the political delegation. In his post-trial deposition, Mr. Austin testified as follows:

> The only discussion I had I recall or can recall, is that there was a fear on the part of certainly Juliano that any closure of Tulsa would appear to be—or might be construed as bad faith because of the F–15 program that we had and the support that we received during some, you know, Save The F–15 Program which happened a year or two before.

Austin's Dep.Tr. 68.

172. The Court finds that MDC, through Project M team leader Mr. Juliano, provided misleading and in some cases false responses during discovery.

**B. *Documents Concerning Notice of the Closing to the United States Government were not Disclosed***

173. Defendant violated its obligations under the Federal Rules of Civil Procedure by failing to produce during discovery any of the disclosure documents provided to the United States Government concerning the Tulsa plant closing. These documents had been requested in pretrial discovery and were never produced.

174. The Court finds that these government disclosure documents were material to the case. According to the trial testimony of Baxter Tate, MDC's authority on government contracts, United States regulations required that MDC disclose its final financial assessment of the plant shutdown and then incorporate these numbers into its forward pricing. At trial, MDC attempted to shore up Defendant's Trial Exhibit 88 (the financial analysis for Option One) through Mr. Tate, who testified that the same information in Exhibit 88 (perhaps the same document) would have been provided to the government in the required disclosure.

175. The post-trial deposition of William Austin, the MDA–East Chief Financial Officer, confirmed Mr. Tate's trial testimony. Mr. Austin testified that notice to the government was a required procedure which was carried out by his staff. He further acknowledged that the financial assumptions determined by Laurette Koellner and Mark Meyerhoff would have been incorporated into the documents providing the notice to the government.

176. As a result, the government disclosure documents became the subject of this Court's April 27, 2000 post-trial Order which directed:

> The Defendant produce to Plaintiffs any and all documents that reflect, in any way, the information submitted to the United States government with respect to the closing of the Tulsa plant, including, without limitation, any work papers prepared in connection with any such submissions. The Court finds this information was clearly requested by Plaintiffs during discovery and the failure to produce such documents was a violation of Defendant's responsibilities under the Federal Rules of Civil Procedure.

April 27, 2000 Order at 1 (footnote omitted).

### i. *Failure to Make a Good Faith Effort*

177. After finding in its April 27 Order that Defendant failed to produce the government disclosure documents, the Court held a hearing on May 10, 2000, to provide MDC with a time period to produce the documents to Plaintiffs. At the hearing, the Court admonished Defendant once again about the importance of complying with the April 27 Order:

> This process is going to be completed and this story will be told. It may or may not be a story ultimately that secures or demonstrates liability, I don't know. But I know this, that the story will be told and that information will be provided. And we've had several different renditions of what occurred and we've had a failure to provide information that would have assisted dramatically the Plaintiffs in making their case. And I won't countenance any further delays or obfuscations or avoidance of responsibilities. These are things, as pointed out by counsel for the Plaintiff, the case is in its sixth year. So I know that you'll do your part, but I think that you need to convey the intensity with which the compliance will be pursued.

05/10/00 Conf.Tr. 9 (quoting the Court).

178. MDC admits that while Baxter Tate was the person who was responsible for the government disclosure and the witness who testified at trial to the existence of the disclosure obligations, it did not even contact him to assist it in finding the disclosure he referenced at trial. In addition, MDC admitted at the September 7 hearing that it had made only "informal" contacts with a low level government staffer even though the trial records showed its extensive high level political and governmental contacts in Washington, D.C. Nor did MDC serve any subpoena or Freedom of Information Act request on the government in response to this Court's

April 27 Order. Defendant does not seek further time to find the missing disclosure, but instead stated that after good faith efforts it cannot produce the documents. The Court finds that, despite its direct order and subsequent admonishments, MDC failed to make a good faith effort to comply with the Court's order and produce the government disclosure documents.

### ii. *Failure to Produce the December 3.1993 Disclosure*

179. MDC further admits it has not produced and cannot provide the December 3, 1993 disclosure it made to the United States Government regarding its reason for closing its Tulsa plant. MDC has not produced the disclosure even though it knows the December 3, 1993 date of the disclosure and the identification number, DISCL–010–026, it assigned for tracking it.

180. MDC's failure to produce the December 3, 1993, disclosure is particularly troubling because MDC admits it was mandated to make such disclosure under the Truth In Negotiations regulations governing defense contractors. Regardless of any litigation, a defense contractor like MDC must, by governmental regulation, preserve government mandated disclosure documents since they are fundamental to the pricing of the company's contracts and its ongoing business with the United States Government. Indeed, the Federal Acquisition Regulations which apply to defense contractors like Defendant required that such documents be preserved for at least three years. FAR Subpart 4.7— Contract Records Retention, 4.703(a)(1). At a minimum, Defendant would have been required to maintain the December 3, 1993 disclosure until the end of 1996, which falls well after the Plaintiffs discovery request for the information. Additionally, there were requirements to preserve the disclosure once the lawsuit was filed in June 21, 1994.

### iii. *Materiality of the December 3, 1993 Disclosure*

181. The Court finds that the December 3, 1993 disclosure and mandatory governmental documents were material and MDC's failure to produce such documents clearly interfered with the Plaintiffs' ability to prove their case. For example, under the Federal Acquisition Regulations, FAR 52.215–27 (Sept.1989), MDC is obliged to disclose the amount of surplus pension funds the company recouped through the plant shutdown. The relevant Federal Acquisition Regulation stated that defense contractors like MDC "shall promptly notify the Contracting Office in writing when it determines that it will terminate a defined benefit plan or otherwise recapture such pension fund assets." FAR 52.215–27 (Sep.1989) At trial, the evidence showed that in conjunction with the closing of the plant, Defendant transferred $11,196,000 pension surplus from its Tulsa segment to another segment of the company.

182. No such notification was ever produced. Indeed, with the December 3, 1993 disclosure missing, neither Plaintiffs nor the Court can determine if MDC made the required notification.

183. As noted above, any communications by Defendant to the government with regard to Tulsa pension savings would be of considerable importance to this matter given Plaintiffs' contentions that these savings were a material factor in the plant closing decision. As early as 1992, MDC opposed the government's position that it should (on the basis of past contributions the government made to funding MDC's pension plans) receive an equitable share of the excess assets of any terminated pension plan. This policy was circulated to the contract administration at Tulsa advising employees to be on guard not to sign any government contract with such a

sharing provision so as not to jeopardize the company-wide policy that the surplus was owed solely to the company.

184. A year before MDC decided to close the Tulsa plant, its government contracting department was well aware that the government would seek to recapture its share of pension surplus arising from a "segment closing" of its business. The "segment closing" issue arose in a 1992 audit conducted by the Defense Contract Audit Agency over the sale of MDC's information systems unit. Joseph Castellano was employed in MDC's government contracting department from June 1992 until 1997 and was aware of the government's interest in such pension assets during that time period and the company's contrary view.

185. By virtue of the plant closing, Defendant transferred over $11 million in pension surplus from its Tulsa segment to another segment of the company, and under the Federal Acquisition Regulations MDC had an obligation to "promptly notify the Contracting Officer in writing" of this recapture of pension fund assets. *See,* Pltfs.Tr.Ex. 114, p. 3, testimony of Lawrence Beebe Trial Tr. 105 and FAR 52.215–27 Sep. 1989.

186. At the September 7, 2000 status hearing, MDC argued that it did notify the government of its recapture of the pension surplus. But MDC's "disclosure" was not made until January, 1996—some two years after Tulsa had closed—and then only in response to an audit inquiry from the Defense Contract Audit Agency. This is not the "prompt" written notification that FAR.52215–27 required. However, if it was the only notification, evidence of MDC's concealment of the surplus pension funds would have bolstered Plaintiffs' claim of the importance of pension savings to the Tulsa decision.

#### iv. *Roger Witte's Files were not Produced*

187. In addition to the December 3, 1993 and pension savings disclosures, there were other governmental communications that Defendant failed to produce despite discovery requests and this Court's April 27 Order. Roger Witte was the Vice President of Contracts and Pricing during the time of the closing of Tulsa. Mr. Witte reported to Mr. Tate, who was in charge of the government disclosure. Mr. Witte's files were never produced to Plaintiffs in discovery and there is now evidence raising questions about whether Mr. Witte's files were lost or destroyed by MDC.

188. In its First Spoliation Report (filed May 23, 2000), Defendant indicated that Mr. Witte's secretary, Nancy Smith, "related that *all* files she had kept for Mr. Witte on the Tulsa plant closing had been destroyed." Def's First Spoliation Report at 2 (emphasis added). In a subsequent filing, Defendant appeared to retreat from this statement. Defendant filed an affidavit by Ms. Smith to the effect that she was asked only about organizational charts and "never possessed any files pertaining to the *Millsap* case or anything to do with Tulsa." Smith Aff. ¶¶ 2 and 4, filed August 8, 2000 as an attachment to Defendant's Response in Opposition to Plaintiffs' Motion for Discovery and Spoliation Sanctions. At the September 7, 2000 status hearing, Defendant took the position that as a Vice President of Contracts and Pricing, Mr. Witte had no such files.

189. The Court finds that as Mr. Witte was a Vice President of Contracts and Pricing, it would have been necessary for him to keep files in order to comply with the federal acquisition regulations, which, as discussed above, mandate government contractors to maintain proper documentation. The Court further finds that the affidavit of Mr. Witte's secretary, Nancy

Smith, is contradicted by the statement in the deposition of Mr. Austin that Mr. Witte was involved in providing written notice to the government with respect to the Tulsa closing. Ms. Smith's affidavit is further undercut by a memo dated March 3, 1994 which Mr. Witte cosigned with Mr. William Austin, showing that Mr. Witte was involved in providing written disclosure to the government about the impact of the Tulsa plant closing. The memo Mr. Witte signed discussed the closure of the Tulsa plant and referenced the missing December 3, 1993 disclosure.

190. The Court finds that Mr. Witte's files were material and were never produced in discovery in this case. MDC obtained the Witte letter from the government's files and produced it for the first time in the post-trial document production ordered by the Court. The Court finds the fact that MDC was unable, or unwilling, to produce the Witte letter from its own files is further evidence that the company destroyed the Witte files or maintained them in such a way as to be unretrievable. In either case, the files were not available for trial. The Court finds that MDC's failure to produce the Witte files constitutes a further violation of Defendant's obligations under the Federal Rules of Civil Procedure and interfered with Plaintiffs' ability to prepare their case for trial.

### v. *The Government Disclosure Documents Produced Post–Trial Would Have Assisted Plaintiffs in Cross– Examination at Trial and in Locating Additional Documents*

191. Pursuant to the Court's May 2, 2000 Order, Defendant has produced a number of documents (some 268 pages of information) that it had not previously produced in discovery. The government documents Defendant has belatedly produced are further evidence of discovery abuse by Defendant. The documents provide proof that the information which was withheld would have materially assisted Plaintiffs in presenting their case and with the discovery process itself.

192. The documents would have materially assisted Plaintiffs in their cross-examinations at trial and in locating additional witnesses and documents such as Mr. Witte and his files. The documents MDC finally produced included the following:

Misc.Ex. 8 March 3, 1994 bid rates memo signed by Roger Witte.

Misc.Ex. 9. 14 January 1994 letter, with 10 attached pages (last 2 numbered 9A and 9B) from B.W. Maddox to P. McCall at Wright Patterson Air Force Base, containing a rate adjustment proposal. Paragraph 5.10 on page 5 of the attachment contains language referencing the Tulsa closure, in accordance with MDC Guidelines under the Truth in Negotiations legislation.

Misc.Ex. 10. Undated section of MDC's forward pricing procedure. On page 3–5, in the paragraph beginning "On 3 December 1993 MDC–TAMS announced ..." there is reference to the disclosure to the government of the closing in Tulsa.

Misc.Ex. 11 26 August 1994 letter from M.F. Maltenfort providing Data Item 165 on the Peace Sun IX Proposal, the Saudi F–15 contract. On the page labeled 27 the closure of Tulsa is again referenced.

Misc.Ex. 12  21 October 1994 letter from M.F. Maltenfort providing Data Item 190 on the Peace Sun IX Proposal, the Saudi F–15 contract. On the page labeled 27 the closure of Tulsa is again referenced.

Misc.Ex. 13  9 November 1994 letter from B.W. Maddox to Polly McCall at Wright Patterson Air Force Base, regarding the Peace Sun IX Proposal (the Saudi F–15 sale).

Misc.Ex. 14  Program F–15 Peace Sun IX Cost Functional Summary Data

Misc.Ex. 15  A file provided by Gene Coyne comparing F–15 production costs as calculated by St. Louis and Tulsa.

193. The Court finds that if Plaintiffs had the government disclosure documents in hand at trial, they could have used them to cross-examine Baxter Tate. At trial, MDC had enormous credibility problems with its explanation that Defendant's Trial Exhibit 88, the one-page financial analysis, filled the hole in the Capellupo briefing memo where a blank page appeared in lieu of any financial analyses. Moreover, the briefing memo called for two financial options, not just the one addressed by Defendant's Trial Exhibit 88.

194. Mr. Tate, the company's expert on government contracts, tried to shore up Exhibit 88 by claiming that it, or a document like it, would have been provided to the government. If Plaintiffs had the recently produced government disclosure documents at trial, they could have shown that Mr. Tate's claim was not supported by the evidence, because none of the disclosure documents resemble Exhibit 88 or incorporate its financial analysis. Such a cross-examination could have cast further doubt on the company's claimed basis for closing the Tulsa plant.

195. There are other ways the government disclosure documents would have assisted Plaintiffs with discovery and the presentation of their case. MDC claims that Miscellaneous Exhibit 14 "is MDC's representation to the government of the financial impact of closing the Tulsa facility." 07/18/00 Defs. Sixth Spoliation Report at 1. Miscellaneous Exhibit 14 presents an estimate that plant closing costs related to the Saudi F–15 proposal would exceed $16 million. Plaintiffs could have used the $16 million estimate of costs to cross-examine Mr. Meyerhoff about his calculations in Defendant's Trial Exhibit 88, which showed overall savings in closing the Tulsa facility to exceed $19,000,000. Mr. Meyerhoff lacked credibility at trial, in part because he could not explain how he computed the figures in Trial Exhibit 88. Mr. Meyerhoff provided no work papers with any backup for his calculation of Trial Exhibit 88. If Plaintiffs had been provided Exhibit 1 in a timely fashion, they could have cross-examined Mr. Meyerhoff about whether he included the $16 million in costs in his calculation of the company's savings.

196. The government disclosure documents Defendant produced indicate that changes to the Saudi F–15 contract were "Computer Tracked." Misc.Ex. 13. The documents provide a tracking number and a date. Defendant's computer tracking would have assisted Plaintiffs in following the entire disclosure process. Instead, they are left to piece the process together from documents that have only recently been produced, some seven years after the announcement of the plant shutdown.

### vi. *Option 2 Documents*

197. The Capellupo briefing memo, Defendant's Trial Exhibit 28, contains two

options with respect to the Tulsa plant. Exhibit 28 referred to "Option 2 (If Politically Required) under which the F15 AFT fuselage work would remain in Tulsa with a small disadvantaged business." Def. Tr.Ex. 28. The April 27, 2000 Order of this Court for post-trial document production also required Defendant to produce "all" documents developed by Mark Meyerhoff with respect to Option 2.

198. Defendant admits that in responding to the April 27 Order it failed to produce Defendant's Trial Exhibit 67R (bates M152 002 1529), which plainly falls within the Option 2 category. The failure to comply with the Order casts doubt on the intensity of the effort undertaken by Mr. Meyerhoff to respond to this Court's Order. Mr. Meyerhoff's failure to identify all Option 2 documents despite the Court's direct Order is similar to his testimony at the November 18, 1999 spoliation hearing. There, the Court again asked Mr. Meyerhoff about additional efforts to find a financial analysis for Option 2.

> THE COURT: And when it became apparent that it was of very priority high concern to get financial data that was provided at this decision meeting, did you go back and re-search?
>
> THE WITNESS: I did not.
>
> THE COURT: So you just simply said, I've given you everything I had?
>
> THE WITNESS: Yes. Yes.
>
> THE COURT: So from the point of your original production, you've done no further search for the information?
>
> THE WITNESS: That is correct.

11/18/99 Tr. 45. Particularly troubling is Defendant's complete failure to explain how Mr. Meyerhoff did not identify Defendant's Trial Exhibit 67R while identifying Defendant's Trial Exhibits 67Q, 67S, 67V and 67W, which are all contained in the same series of documents in Defendant's Trial Exhibit.

199. The failure of Mr. Meyerhoff to identify Exhibit 67R as an Option 2 document also bears on Mr. Meyerhoff's credibility at trial. The exhibit proves that the political considerations were communicated to Mr. Meyerhoff and that Mr. Meyerhoff included such considerations in his analysis of Option 2. Such evidence directly contradicts Mr. Meyerhoff's testimony at trial:

> THE COURT: But I'm trying to understand the nature and content of those communications. For example, if the lease were going to be funded by the Air Force, right, carried at no cost, that would be something that would necessarily change the pure analysis; right?
>
> THE WITNESS: Yes, correct.
>
> THE COURT: Now, was that communicated in any way to the team for purposes of changing those numbers?
>
> THE WITNESS: No. And the numbers you have seen we assumed that the Government was going to charge us $5.4 million, I think was the number, by year.
>
> THE COURT: So there was no discussion or indication of any kind that that number should be anything other than the cost number, as opposed to what apparently was a representation or had been some indication that there was a representations that the Air Force would render that [a] zero number; right?
>
> THE WITNESS: There was no discussions to that effect.

> •    •    •    •    •

> THE COURT: So if in fact some public official here is under the impression that they were being represented certain things about what the company would take into account, it never really got into the decision making process; right?

THE WITNESS: Not as far as I was concerned.

04/26/99 Tr. 477–78, 481.

200. Defendant's Trial Exhibit 67R shows Mr. Meyerhoff testified inaccurately, given that the financial assumptions in his Option 2 analysis were clearly based upon the following political considerations: (a) that the F–15 work would stay in Tulsa with an SDB; (b) that the City of Tulsa would supply an alternate building at its cost; (c) that there would be no disruption of learning because the work force would be the former Tulsa employees; and (d) the cost of returning the property to the original state ($15 million) would be abated by the Air Force.

### C. *Documents Concerning the Executive Council's Decisions were not Produced or Disclosed*

201. The group that managed MDC was called the Executive Council. This group later became known as the Office of the Chairman. The group included the corporation's Chief Executive Officer, John McDonnell, and the President and Chief Operating Officer, Jerry Johnston. Also included in the group was the Chief Financial Officer, Herb Lanese, and a representative from human resources. As President of McDonnell Douglas Aerospace, John Capellupo was a member of the Executive Council, as were the Presidents of MDC's other operating divisions.

202. Mr. Capellupo testified that plant closing decisions presented serious issues for MDC, which were discussed by the Executive Council periodically. While Mr. Capellupo admitted sharing summary information with the Executive Council, no such documents have been produced or identified as having been shared with that decision-making body.

203. The Chairman of MDC had an Executive Assistant, Bud Coyle, who attended the meetings of the Executive Council. Mr. Coyle took notes of the meetings. No notes of the Executive Council meetings were ever produced by MDC in discovery or at trial, although the evidence showed the Executive Council met on the various plant closings, including its Tulsa facility.

204. No documents that were presented to the Executive Council concerning any plant closings were ever produced by Defendant in discovery or at trial.

### D. *Attempts to Conceal the Identity of MDC's Central Financial Figure*

205. It was not until after the trial, in response to the Court's question of whether MDC destroyed the precipitating documents from the Capellupo briefing, that Mr. Austin was identified by Defendant as the witness who could provide "the previously missing link in the chain of evidence" about the financial documents that were provided to Mr. Capellupo at the October 22 briefing.

206. Like the date and subject matter of the October 22 Capellupo briefing, and the documents presented at the meeting, Mr. Austin's attendance at the key briefing should have been disclosed by Defendant in its sworn answers to Plaintiffs' Interrogatory One. The fact that Mr. Juliano would later testify at trial that Mr. Austin was in attendance at the Capellupo briefing to address the financial basis for the closing proves the information should have been timely provided by Defendant in response to Plaintiffs' interrogatories.

207. There is additional evidence establishing that Defendant knew all along that Mr. Austin was a key participant in the decision making process. In the months before trial, after this Court denied Defendant's Motion for Summary Judgment due to the company's inability to produce the financial and economic bases for the Tulsa closing, Mr. Austin's successor at MDC,

Roger Crone, called Mr. Austin about testifying at trial. Mr. Crone told Mr. Austin he might be asked to testify because he was involved in the decision-making process.

208. In fact, during discovery, MDC represented that Mr. Austin had no relevant information. On September 17, 1997, in response to Plaintiffs' request to take Mr. Austin's deposition, Defendant wrote to Plaintiffs' counsel that Mr. Austin was a person whose deposition was of "questionable validity and relevance." Misc.Ex. 16. Defendant indicated it would file an objection with the Magistrate Judge if Plaintiffs continued to pursue their request to depose Mr. Austin.

209. Defendant's September 17, 1997, representation that Mr. Austin was not relevant was directly controverted by the evidence adduced at trial, which established that Mr. Austin was in fact the person responsible for presenting the financial analysis to the final decision maker at the point the final decision was being made.

210. The Court finds that Mr. Austin was one of a handful of people involved in making the decision to close the Tulsa plant. Since Mr. Austin was Mr. Capellupo's primary financial advisor when considering whether to close Tulsa, he should have been identified as a decision maker in response to Plaintiffs' Interrogatory Six. MDC falsely stated that Mr. Austin was not a relevant witness, thus averting proper discovery.

211. The post-trial deposition of Mr. Austin showed that Plaintiffs were further prejudiced by Defendant's intentional failure to identify Mr. Austin. The deposition shows Defendant failed to produce Mr. Austin's calendar of appointments, which could have provided Plaintiffs with the key meeting dates for Project M, perhaps even pinpointing the October 22, 1993 Capellupo meeting. Mr. Austin was shown Plaintiffs'

Interrogatory Six at his post-trial deposition, which requested the dates of the decision-making meetings. He did not remember seeing this interrogatory previously or having ever been asked to identify the meetings, conferences, or discussions he attended with other decision makers regarding the plant closing.

212. Plaintiffs' document requests asked Defendant to produce all calendars, log books, appointment books, and schedules for the decision makers identified in response to Interrogatory One. As described above, MDC failed to identify Mr. Austin as a decision maker.

213. In his post-trial deposition, Mr. Austin admitted that his secretary maintained a calendar of his appointments on a printed card. Mr. Austin's calendar was not produced in response to document request No. Three or otherwise. The Court finds that Defendant was required to produce Mr. Austin's calendar, and it was a further violation of Defendant's discovery obligations not to produce it.

214. Defendant's efforts to avoid the testimony of Mr. Austin, the central financial figure, continued even in the post-trial phase of the case.

215. As noted above, Defendant made a decision not to call Mr. Austin at trial. It was only when the Court raised the question of whether the precipitating documents had been destroyed that the company filed a motion for leave to submit an affidavit by Mr. Austin. Plaintiffs objected to the admission of the Austin affidavit, and the Court permitted a further round of depositions in preparation for the hearing on spoliation. The Court then made several accommodations in its schedule to facilitate the live in-Court examination of Mr. Austin at the post-trial spoliation hearing. The Court canceled the initial September 30, 1999 spoliation hearing date. It then left the date open indefinite-

ly to accommodate the schedule of Defendant's witnesses.

216. Prior to trial, MDC approached Mr. Austin through Roger Crone, MDC's Chief Financial Officer. Mr. Crone told Mr. Austin he might be needed to participate at trial and Mr. Austin replied:

> I said I would—I certainly would not like to go to Tulsa, I have a very busy schedule, and if there was a way not to include me, that would be my preference. But I also said that if it was absolutely required, I would do—I would do it for—I would do it.

Austin Dep.Tr. at 40. It appears from Mr. Austin's sworn deposition testimony that Defendant merely had to have Mr. Crone call Mr. Austin again and tell him it was necessary for him to provide live testimony at the November 18 spoliation hearing. That Defendant chose not to have Mr. Crone re-contact Mr. Austin, or even inform Mr. Austin of this Court's schedule accommodations, supports an inference that Defendant was afraid to have Mr. Austin come forward, preferring to shelter him from cross-examination in the courtroom and from a live evaluation of credibility by the Court.

217. The Court can only conclude from Defendant's actions that MDC did not want Mr. Austin to appear before it as a live witness, even though it knew of this Court's concerns about the company's overall credibility with respect to the precipitating documents for the Tulsa plant closing. The Court finds that from the outset of discovery in this matter, Defendant has engaged in a pattern of actions in which it undertook to shield Mr. Austin from testifying. When MDC realized that it needed Mr. Austin to corroborate Mr. Juliano's testimony, it still refused to have him appear live before the Court.

218. In sum, wide-ranging abuse of discovery in this case informs the Court's conclusion that Defendant's proffered reasons for closing the Tulsa plant are pretextual. The Court finds, as it stated earlier:

> [t]he pattern of discovery abuse informs the question of the ultimate, does the Court believe their statement. They have lied in discovery, they have refused to produce documents, they have made claims about whether or not they were even aware of documents or what they meant. They've tried to avoid the testimony of the central financial figure in this matter, and subsequently. So the discovery abuse certainly goes to the question of credibility.

09/07/00 Tr. 57 (quoting the Court).

## III. CONCLUSIONS OF LAW

### A. Ruling on the Merits

219. Plaintiffs allege that MDC violated section 510 of ERISA when it closed the Tulsa facility. That section of ERISA provides, in pertinent part:

> [i]t shall be unlawful for any person to discharge ... or discriminate against a participant or beneficiary for ... the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan (or ERISA) ...

220. A plaintiff alleging a violation of section 510 must prove that the employer discharged or discriminated against the plaintiff with the specific intent to interfere with the attainment of protected benefits. *Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3d Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987); *Hopkins v. Seagate*, 30 F.3d 104, 106 (10th Cir.1994); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222 (11th Cir. 1993); *Conkwright v. Westinghouse Electric Corp.*, 933 F.2d 231, 238 (4th Cir.1991).

▮▮ 221. A section 510 claimant need not show that interference with protected benefits is the sole reason for discharge,

but must show more than the incidental loss of benefits as a result of the discharge. *Seaman v. Arvida Realty Sales,* 985 F.2d 543, 546 (11th Cir.1993). A section 510 claimant must establish that the employer's alleged desire to block the attainment of benefits rights was a determinative factor in the challenged decision. *Gavalik v. Continental Can Co.,* 812 F.2d 834, 860 (3d Cir.), *cert. denied,* S.Ct. 495 (1987)

■ 222. Every time an employee closes part of its business, savings on employee benefits will be realized. That is not unlawful. Plaintiffs must show more than that MDC closed the Tulsa plant to save money. As stated by the Fourth Circuit:

> [Plaintiff] tries to save his claim by citing statements that [defendant] sought to meet its "financial need" by terminating him, and that financial need necessarily includes pension costs. [Plaintiff's] suggestion that [defendant] acted illegally because it acted to save money proves too much. Under that reasoning, any actions by an employer that result in savings would be suspect. It is obvious that benefit costs make up a large amount of the costs of an employee to a company, and that pension rights are a substantial component of benefit costs, but these undeniable propositions are not sufficient, standing alone to prove the requisite intent by the path of pretext.

*Conkwright v. Westinghouse Electric Corp.,* 933 F.2d 231, 239 (4th Cir.1991).

223. In analyzing MDC's actions and decisions, the Court must give great deference to MDC in making its business decisions. MDC is entitled to make its own business decisions and need not do so in a manner which meets with the approval of the Court, Plaintiffs, or any other party. ERISA, like the other statutes regulating workplace conduct, is not to be used as a vehicle for substituting another's business judgment for which could have, or should

have, been done. As the Court emphasized in connection with Defendant's motion for summary judgment, MDC's business judgment is not to be second-guessed; it is only where there is a legally sufficient basis to find illegal discrimination that an employer's business judgment must give way. *Sanchez v. Philip Morris, Inc.,* 992 F.2d 244 (10th Cir.1993). *See also, Lucas v. Dover Corp., Norris Div.,* 857 F.2d 1397, 1403–04 (10th Cir.1988) ("[t]his court will not second guess business decisions made by employers, in the absence of impermissible motives."); *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988). *See also Jorgensen v. Modern Woodmen of America,* 761 F.2d 502, 505 (8th Cir.1985); *Bossalina v. Lever Bros. Co.,* 47 FEP Cases 1264, 1267 (D.Md.1986), *aff'd,* 849 F.2d 604 (4th Cir.1988) ("[i]t is not within the province of plaintiffs or of the Court to review the soundness of [the employer's] business judgment either in the evaluation of particular employees or in deciding to engage in a reduction of . . . force.")

■ 224. To establish a section 510 violation, plaintiffs must prove that an employer was at least in part motivated by a desire to avoid liability for ERISA protected benefits. Courts analyzing section 510 cases, including this Court, have borrowed the analytical framework for proving discriminatory intent in Title VII cases. *Gavalik v. Continental Can Co.,* 812 F.2d 834, 851–53 (3d Cir.) cert. denied, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987); *Pickering v. USX Corp.,* 809 F.Supp. 1501, 1532 (D.Utah 1992).

225. Applying the *McDonnell Douglas* framework, Plaintiffs must first make out a *prima facie* case. A *prima facie* case may be established by proof of: (1) prohibited employer conduct; (2) taken for the purpose of interfering; (3) with the attainment of any ERISA-protected right. *Berger v. Edgewater Steel Co.,* 911 F.2d 911,

922 (3d Cir.1990), *cert. denied,* 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); *Gavalik v. Continental Can Co.,* 812 F.2d 834, 852 (3d Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987).

226. At trial, the Court denied Defendant's motion to dismiss at the end of Plaintiffs' case in chief for Plaintiffs' alleged failure to make out a prima facie case. MDC then responded to its burden of production by (a) denying that pension and health care benefits played any part in the Tulsa plant closing decision, and (b) arguing that in the face of excess capacity company-wide, MDC chose Tulsa for closing because the financial savings from the plant closing outweighed the costs of leaving it open.

227. The Supreme Court recently addressed the analytical framework established by *McDonnell Douglas* in the case of *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), which concerned a claim under the Age Discrimination in Employment Act ("ADEA").

228. Under *Reeves,* if the employer has produced sufficient evidence to support a nondiscriminatory explanation for its decision, the plaintiff is afforded an opportunity to prove by a preponderance of all the evidence that the legitimate reasons offered by the defendant were not its true or sole reasons, but were a pretext for discrimination. *Reeves,* 120 S.Ct. at 2106. "A plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge, only that it was a 'motivating factor.'" *See, e.g., Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1224 (11th Cir.1993); *Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1043 (6th Cir.1992); *Meredith v. Navistar Int'l Transp. Corp.,* 935 F.2d 124, 127 (7th Cir.1991).

■ 229. It is now appropriate for the Court to determine whether Defendant's

explanation is worthy of credence. If Defendant's explanation is not worthy of credence, *Reeves* makes clear that it is then *"permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves,* 120 S.Ct. at 2108. This framework simply follows the general law of evidence:

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the fact-finder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."

*Reeves,* 120 S.Ct. at 2108 (citation omitted).

■ 230. In the instant case, the Court finds that the reasons put forward by MDC for closing its Tulsa operation are not the whole or entire reason, and that the claim that the plant closed for financial reasons related to excess capacity are pretextual. As established by the findings of fact, notwithstanding the extensive discovery undertaken in this case, repeated direct inquiries from the Court, along with leave of Court for supplemental filings, MDC failed to produce competent and credible evidence relating to the economic considerations and financial information upon which Mr. Capellupo, the Project M team, and the Office of the Chairman purportedly relied in making the ultimate decision to close the Tulsa plant. As this Court stated in denying Defendant's summary judgment motion, the Court is unable to give deference to a business decision when the evidence produced by Defendant does not credibly support the characterization as a "business decision."

231. The fact finder's disbelief of the reasons put forward by a defendant "may be quite persuasive" of intentional discrimination "particularly if disbelief is accompanied by a suspicion of mendacity." *Reeves,* 120 S.Ct. at 2108, quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Here, Defendant's mendacity is manifest. Specifically, as identified in the Findings of Fact, MDC's mendacity is established by the untruthful and misleading answers provided to Plaintiffs under oath in its discovery responses, its depositions and in its trial testimony.

232. The record further reflects a corporate culture of mendacity, as evidenced by the testimony of plant manager Mr. Bittle and the disregard for the truth evidenced by the testimony of CEO John McDonnell. As the Court observed during the trial:

We have sat here for two weeks and listened to testimony that I think at some places is almost knee buckling in the way in which it evidences an abject disregard for people's representations, people's representations to their employees, their teammates, people's representations to the public, people's representations to public officials. We have other kinds of testimony: Mr. Bittle himself indicating he believed himself to be an unwitting instrument of fraud on the employees and the public; I think that the notion of engaging in negotiations that are known to not to mean to go to anything; and the ultimate question of closing a plant, recognizing the broad latitude the company has under the law, it's entirely appropriate to review the numbers as long as improper numbers are not considered; but to hear testimony that there was never even consideration as to whether there were commitments, express or implied,

to employees, to the public, to public officials.

Tr. 1143.

233. The Court finds that the testimony of Defendant's key witness at trial on the reasons for the Tulsa plant closing, Project M Team leader Peter Juliano, was clearly untrue, not solely as to tangential issues, but as to the material facts of the case as well. The Court finds that the evidence establishes the company's mendacious conduct.

234. The Court further finds that Defendant's actions evinces a history of mendacity as seen in the pattern of bad faith conduct in which it participated in the events leading up to the lawsuit. At trial, Mr. Juliano admitted under oath that MDC sought to short-circuit lease negotiations and was well aware that his conduct rendered those negotiations to be in bad faith. The Court adheres to its conclusion at trial:

Sending somebody to negotiate a lease when in fact they can't negotiate the time of day, and yet to pretend that you're negotiating a lease goes beyond bad faith negotiations, it's abject dishonesty.

Tr. 116.

235. This was not an isolated incident. The Court also received evidence that Tulsa plant manager Don Bittle believed himself to be an unwitting instrument of fraud on MDC's employees and the public. Mr. Bittle was kept in the dark by Mr. Juliano and other members of upper management, who never told him that the promise that the employees' jobs would last for at least three more years was untrue. Nor did they even inform him that Tulsa was under Project M scrutiny for closure.

236. The Court has previously stated that the decision of whether the company is telling the truth about its reasons for

closing the Tulsa plant is "informed in the first instance by the general credibility of the defendant ... [t]hat deals with Mr. Bittle, it deals with the short—circuiting of the lease negotiations, it deals with Mr. McDonnell's extraordinary statement that they never considered for a moment what commitments and representations they've made to the public or public officials or community leaders or their own employees, they never considered what they were or whether or not they were binding when they went ahead to make the decision. So it certainly goes-all of those elements of general credibility are present."

237. The decision about whether Defendant has provided its true reasons for closing Tulsa is also informed by the pattern of discovery abuse that has taken place in this case in which Defendant repeatedly tried to mislead Plaintiffs about its decision-making process. The Findings of Fact demonstrate Defendant's bad faith conduct throughout discovery, at trial, and continuing throughout the post trial phase of the case, including:

- In sworn interrogatory answers, MDC claimed to be unable to identify any Project M meetings where the Tulsa closing was discussed with decision makers; yet it claimed through its witnesses at trial that John Capellupo was provided a final briefing on October 22, 1993.

- In sworn interrogatory answers, MDC failed to identify William Austin as a participant in the decision to close the Tulsa plant; yet it claimed through its witnesses at trial that Mr. Austin was the person charged with briefing Mr. Capellupo on the financial aspects of the Tulsa plant closing.

- Project M team leader Peter Juliano provided sworn deposition testimony that he was not privy to the financial documents and then at trial testified he was responsible for preparing a final briefing memo for Mr. Capellupo referencing cost data from two financial options.

- Peter Juliano provided sworn testimony at his deposition that he could not identify the Capellupo briefing document; yet he claimed at trial that Defendant's Exhibit 28 was generated under his direction and used by him personally to brief Mr. Capellupo.

- Peter Juliano provided sworn deposition testimony claiming that he did not know the significance of Option 2, the SDB scenario or the meaning of "if politically required"; yet he testified at trial that Option 2 was included at his insistence and admitted political risks might compel use of the option.

- Despite the direct inquiry from the Court at the summary judgment hearing for the closing documents, MDC failed to provide any documents, financial or otherwise, that the Executive Council relied upon in reviewing the Project M recommendation to close the Tulsa facility.

- During discovery, Defendant represented to Magistrate Judge McCarthy on more than one occasion that "all" documents relevant to the closing of the Tulsa plant had been produced to Plaintiffs. A review of the record reveals that such representations were false. MDC failed to produce the information submitted to the United States government with respect to the closing of the Tulsa plant. The Court has previously ruled that "the failure to produce such documents was a violation of Defendant's responsibilities under the Federal Rules of Civil Procedure."

After seeking leave of Court to provide testimony of William Austin at the Spoliation hearing the Defendant did not inform the witness of the

schedule accommodations this Court made in order to have the witness appear before it live.

238. In addition to the general lack of credibility and the pattern of discovery abuse, the credibility of the story itself bears on the question of whether the Court believes Defendant's claimed basis for closing the Tulsa plant. That question is informed by Defendant's failure in discovery to identify the precipitating documents upon which it based its decision to close the plant and the Project M team's complete lack of recollection concerning the cost savings projected to be generated from the plant closing.

239. The credibility decision is further informed by the different renditions of the story and the changing documents Defendant purportedly relied upon to support its reason to close the plant. It is also informed by Defendant's failure to identify the documents it now contends are the closing documents during the discovery phase of the case. Then too, the financial documents Defendant relied upon in support of its summary judgment motion to show the cost savings it achieved were supported by the affidavit of Peter Juliano. But Mr. Capellupo did not recall seeing the summary schedule identified by Mr. Juliano, found it to be in error and contended it would not have been used by him in making his decision.

240. With its key document clearly contradicted by the deposition testimony of Mr. Capellupo, the primary decision maker, the Court made a direct order to Defendant at the summary judgment hearing to provide it with the documents showing the financial analysis it used in making its recommendation to close the Tulsa facility. In response to that order, Defendant produced a patchwork of material which did not constitute competent evidence of the economic and financial basis relied upon by the Project M team, Mr. Capellupo, or the

Executive Council for closing the Tulsa facility. Defendant produced what were later identified as Defendant's Trial Exhibits 28 and 88.

241. The documents themselves further undermined the credibility of MDC's story. Defendant's Trial Exhibit 28, the seven page summary briefing memo, contains a blank page six titled "Cost Impacts." Mr. Capellupo at his deposition and at trial indicated that the normal practice would have been to provide him a document with the financial analysis in the set piece. When asked if Exhibit 28 was the same type of document he would have been expected to receive, he testified it was "with the exception of the blank page." Tr. 972. Given the great attention to detail, the considerable effort the Court observed in many of the Project M documents in the trial record, it is inconsistent with the testimony of MDC's own witnesses that the summary briefing memo presented to Mr. Capellupo would contain a blank page where the financial analysis was called for in the document.

242. According to Defendant, the page was left blank for security reasons. However, the briefing memo itself contains a bottom line cost savings number for each of the two possible options under evaluation. Defendant's attempt to fill the gap created by the blank page in Exhibit 28 with Defendant's Trial Exhibit 88 is like trying to force a round peg in a square hole. Exhibit 88 is a one-page financial summary entitled "MDA–East Consolidation Project, Impact Programs." While Exhibit 28 references two cost options, Exhibit 88 addresses only the financial impact of option one. Moreover, unlike many other documents Defendant sought to keep private, there is no confidential marking on Exhibit 88. The failure to stamp the document for privacy concerns undermines MDC's claim that the docu-

ment was too sensitive to be included in Exhibit 28. In contrast, Exhibit 28 does bear the "MDC–Private" marking.

243. The Court finds that the testimony of the Defendant's trial witnesses further undermines the credibility of MDC's story. The person responsible for presenting the financial information was William Austin, the Chief Financial Officer for MDA–East. The person responsible for preparing Mr. Austin was Laurette Koellner. Ms. Koellner was not familiar with Exhibit 28 and had never heard of Option 2, which would leave the F–15 aft fuselage work in Tulsa with a small disadvantaged business contractor.

244. The Court finds that MDC's story is not credible. The Court agrees with Mr. Capellupo's testimony that it was inconceivable that if there were two cost options under consideration, Mr. Austin would be unprepared to talk about them both. As Mr. Capellupo testified at trial, "I would be absolutely amazed if that happened." Tr. 1056.

245. The Court does not credit Defendant's post-trial efforts to amend its story to the effect that Mark Meyerhoff by passed his immediate supervisor, Laurette Koellner, by briefing Mr. Austin on Option 2 himself and that neither Mr. Meyerhoff, nor Mr. Austin told Ms. Koellner about it. Again, this testimony is not consistent with the hierarchical culture at MDC, which culture was clearly established at trial by Defendant's own witnesses.

246. The Court also rejects Defendant's explanation that it was not necessary to have the financial analysis for Option 2 available at the Capellupo briefing. The agenda for the Capellupo briefing called for a "Washington Update." The Project M documents showed that Defendant was still concerned about the political ramifications of a decision to close Tulsa at the time of the Capellupo briefing. Option 2 was far outside the realm of responsibility of Mr. Austin's financial group because it was politically driven by the company's lobbying group in Washington, D.C. Even if the financial group did not believe Option 2 was the best financial option, it is not credible that they would fail to prepare a financial analysis of it. The financial group simply did not have the authority to reject that option.

247. The Court adheres to its conclusion based on the evidence with respect to the credibility of MDC's story, expressed at the September 7, 2000 hearing:

> The story itself, the credibility of the story; whether it makes sense in the light of the sworn testimony that the events unfolded on that particular day in the manner that they described with blanks in the documents, inconsistent with practice; inconsistent with years of experience, inconsistent with everything that we know about the individuals and their conduct as employees.

09/07/00 Tr. 57–58.

248. The question of whether the Court believes MDC's story is further informed by Defendant's conduct in the post-trial phase of the case. Defendant has failed to produce any documents consistent with its present story. The Project M team prepared documents on the plant closing issue not only for Mr. Capellupo, but for Defendant's Executive Council. None of the documents that were presented to the Executive Council have been produced, so there is no corroboration that Defendant's Trial Exhibits 28 and 88 are the precipitating documents.

249. In an effort to shore up the present story at trial, Baxter Tate, MDC's expert on defense contracting, testified that the United States Government would have been provided notice of the cost savings appearing in Defendant's Trial Exhibit 88 (perhaps provided the very document). According to Mr. Tate, Defendant

was required under defense contract regulations to provide the government with such notice. After trial, on May 2, 2000, the Court ordered Defendant to produce "any and all documents that reflect, in any way, information submitted to the United States government with respect to the closing of the plant, including, without limitation, any work papers prepared in connection with such submissions." Order May 2, 2000. Those documents should have been provided to Plaintiffs in response to their discovery requests.

250. MDC made little or no effort to locate these documents after trial, not even bothering to contact Mr. Tate to assist them in finding the documents.

251. There is no corroboration of Mr. Tate's trial testimony in the documents Defendant has produced. None of the cost savings that appear in Defendant's Trial Exhibit 88 appear in the documents Defendant has produced in response to this Order.

252. MDC admits it has not produced all the documents pertaining to the government notice. While it has identified a December 3, 1993 disclosure it made to the government in conjunction with its announcement to the public about the Tulsa plant closing, it has not produced the document. Despite the importance of finding the document (given the Court's credibility and spoliation concerns) MDC made only informal inquiries to the government, apparently asking only that it voluntarily assist the company in finding the document. Those informal efforts did not result in production of the December 3, 1993 disclosure and Defendant has represented in filings with the Court that it cannot find the document.

253. In addition, the files of Roger Witte, who was involved in the government disclosure, have never been produced. The government disclosure documents Defendant produced in response to the Court's Order finding that it had violated discovery show such documents would have materially assisted Plaintiffs in the preparation of their case.

254. In its May 2, 2000 Order the Court also directed the Defendant to produce "all documents that reflect, in any way, information developed by Mark Meyerhoff with respect to Option 2 is described in the parties' proposed findings of fact and conclusions of law, including without limitation all work papers." Order May 2, 2000. MDC admits that in response Mr. Meyerhoff did not provide Plaintiffs' Exhibit 67R.

255. Defendant never explained how Mr. Meyerhoff failed to produce 67R, which should have been sandwiched between Defendant's Trial Exhibits 67Q and 67S. Regardless of the reason, the Court finds that Defendant's Trial Exhibit 67R undermines the credibility of Defendant's case at trial. Defendant, through Mr. Meyerhoff's testimony, claimed the political considerations mentioned in Defendant's Trial Exhibit 28, Capellupo summary briefing and other Project M documents were not incorporated into the financial analysis of the transaction. The assumptions that Exhibit 67R were based upon demonstrate the opposite: that the political considerations concerning that the work would remain in Tulsa at a facility provided by the City of Tulsa and with concessions on the environmental clean up of Air Force Plant 3 provided by the United States Government. The Court finds that Mr. Meyerhoff's testimony in this regard in not credible and that his testimony at the spoliation hearing that he may have just made up these assumptions is not to be believed.

256. The record supports the Court statements at the September 7, 2000 hear-

ing with respect to the impact of the post-trial documentation efforts on this case:

Whether the story makes any sense; whether there's any documents that support the story; the inability to produce or refusal to produce any documentary evidence that would be consistent with this otherwise incredible story; the refusal to produce documents; the failure in the post-trial setting to bolster their position as to the new found role of Mr. Meyerhoff in this decision; his failure to go look for documents; the failure to tell Mr. Austin even that he was desired to be present here and what wide latitude that this Court was giving scheduling wise to bring him here, and yet not even telling him; the failure evidenced today that the one person who brought on the post-trial inquiry into Government filings, that is Baxter Tate, that counsel hasn't even talked to Mr. Tate, and I fear perhaps not talked to other of the central figures in this matter.

09/07/00 Tr. 58.

257. For all the reasons set forth herein above, the Court does not believe Defendant's proffered reason for closing the Tulsa plant. The Supreme Court has held that "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves,* 120 S.Ct. at 2108–09. Here, Defendant was in the best position to put forth the actual reasons for its decision, if in fact such reasons were legitimate. Instead, however, it has repeatedly failed to do so, engaging in a pattern of discovery abuse and refusal to respond to proper inquiries by both Plaintiffs and the Court.

258. Plaintiffs' prima facie case establishes that Defendant valued its pension surplus in a number of ways and it provided income on the corporation's balance sheet. MDC was being instructed by its outside actuaries with respect to how it could maximize the pension surplus by selecting for layoff or plant closing its older, more senior employees. Defendant also knew that there were significant costs that would occur if the Tulsa plant stayed open after 1993, when many employees would cross over to age 55 and qualify for greater pension benefits. This $24.7 million in cost savings would be material in a transaction the company says would have otherwise saved it $19 million.

259. The Court finds that Defendant's claim that its Project M team took account of all kinds of costs, but never valued the pension and medical cost/savings is inconsistent with the evidence and cannot be credited. Not only did the Project M documents call for the pension cost/savings to be valued, but Mark Meyerhoff's notes reflect he was told to "call Rich Smoski (Pension benefits) effect on cost/earnings?" Pltfs Tr.Ex. 58, 61, 62. It was Mr. Smoski who was not only in charge of the pension area, but who was Defendant's contact person for receiving memos from its outside actuaries on the demographic impact of layoffs and plant closings on the pension surplus. Mr. Meyerhoff's claim that he did not recall the meaning of his notes to call Mr. Smoski, like so much of his testimony, simply is not credible.

260. Of equal concern to the Court is that Mr. Meyerhoff has provided no underlying work papers for his analysis of Exhibit 88, the Option One financial analysis. Nor could he recall any of the underlying costs that went into the calculation when asked at trial. Instead, Defendant asks the Court to accept Mr. Meyerhoff's word that pension and retiree health care costs were not included in the calculation. Given the evidence in Plaintiffs' prima facie case that the pension surplus was of great importance to MDC and that the Project

M documents and Mr. Meyerhoff's own notes call for the cost savings to be accounted for, coupled with Mr. Meyerhoff's general lack of credibility described above, the Court is unwilling and unable to accept as true Mr. Meyerhoff's testimony in this regard.

261. The $11 million pension surplus that Defendant transferred to another segment of its business after the Tulsa plant closing would have been material in a transaction the company says would have otherwise saved it $19 million dollars over a four year period. Under the FAR regulations, MDC was required to disclose promptly to the United States Government the amount of the pension surplus it recaptured from the Tulsa closing. (FAR 52.215–27) Despite the Court's request for all government disclosure documents there were no documents reflecting that such a disclosure was made. Instead, the subject of the pension savings generated from the Tulsa plant closing was reported only as a result of an audit by the Defense Contract Audit Agency in 1996.

262. Plaintiffs established in their prima facie case that Defendant wanted to preserve the pension surplus from a plant closing for itself. The failure of Defendant to provide the government with the required prompt notice of the pension surplus it recovered from the Tulsa plant closing is consistent with the evidence showing that Defendant was motivated by its interest to maximize the benefits from the pension surplus for the company and avoid having to share any of the surplus with the government.

263. The Court finds that MDC's inability to produce financial and economic bases for the Tulsa closing and its overall lack of credibility about its decision-making process is probative of pretext, and is legally sufficient, combined with the other circumstantial evidence presented by Plaintiffs, to support the inference that the proffered reason was not the true reason for the employment decision, and interference with Plaintiffs' rights was.

264. Based on the above, the Court hereby enters partial judgment on the issue of liability pursuant to Fed.R.Civ.P. 54 in favor of Plaintiffs (including the Plaintiff class) and against Defendant, in that Defendant violated section 510 of ERISA, 29 U.S.C. § 1140, to their detriment.

**B. *Discovery Abuse and Spoliation*** .

█ 265. Both in addition and in the alternative, the Court further finds that substantial sanctions must be imposed against Defendant for multiple discovery abuses, which abuses occurred before, during and after trial. The Court orders sanctions pursuant to the Court's inherent powers, Rule 37 of the Federal Rules of Civil Procedure, and the doctrine of spoliation. As stated by Jamie Gorelick, in her treatise, Destruction of Evidence § 2.1 at 10 and Preface xiii (Cumulative Supplement, 2000), "[the line between the spoliation inference and discovery sanctions has begun to blur, with many courts treating the two doctrines as one.]" She continued, "[s]ome courts do not recognize the distinction at all, and recent judicial opinions indicate there may be a trend towards merging or considering the two doctrines together." (*Id.* § 2.1 at 10)

266. A merged approach makes particular sense in this case, where Defendant's discovery conduct is at issue, since, by definition, it brings Rule 37 discovery rules to bear. Here, the Court ordered Defendant to produce the complete Project M financial analysis and, later, the government disclosure documents and such Orders are governed by Rule 37. *See Brandt v. Vulcan, Inc.,* 30 F.3d 752, 756 n. 7 (7th Cir.1994) ("while courts have only applied Rule 37(b)(2) where parties have violated a court order, courts have broadly

interpreted what constitutes an 'order' for purposes of imposing sanctions ...") *Properties Int'l., Ltd. v. Turner*, 706 F.2d 308, 310 (11th Cir.1983) (order found where a court directed a party to provide its opponent "with complete discovery").

267. Moreover, it is well-settled that a defendant cannot maliciously conceal facts of which it has knowledge and an obligation to produce. When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991) The inherent power encompasses the power to sanction attorney or party misconduct, and includes the power to enter a default judgment or a lesser sanction. *See Chambers*, 501 U.S. at 43–45, 111 S.Ct., at 2132–33; *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765–66, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980).

268. There is at least one distinction between the various approaches. A sanction under the Federal Rule of Civil Procedure 37, does not require a finding of bad faith. In ordering the parties to brief the question of spoliation, the Court directed them to consider *Jordan F. Miller Corp. American Eagle Ins. Co. v. Mid–Continent Aircraft Serv.*, 1998 WL 68879*3 (10th Cir. February 20, 1998), a case recognizing the litigant's "duty to preserve evidence that he knows or should know is relevant to imminent or ongoing litigation." In *Jordan*, even though the loss of the evidence was neither intentional nor in bad faith, the Tenth Circuit affirmed the sanction of dismissal of the claim for the failure to preserve evidence. Depending on the severity of the sanction sought, however, the law of this circuit requires a showing of bad faith. *Aramburu v. The Boeing Company*, 112 F.3d 1398, 1407 (10th Cir.1997) (bad faith required where an evidentiary inference is sought).

269. In this case, the additional showing of bad faith for a spoliation sanction does not warrant separate consideration because the Court's Findings of Fact establish that MDC intentionally and in bad faith withheld or possibly destroyed documents, and then attempted to mislead the Plaintiffs and the Court about its conduct. Accordingly, the Court's Findings of Fact support sanctions under Rule 37, the Court's inherent powers and/or the law of spoliation.

270. MDC demonstrated its culpability not only by purposely suppressing pertinent documents, but also by its subsequent attempts to conceal its actions. "A litigant has a duty to preserve evidence that he knows or should know is relevant to imminent or ongoing litigation." *Jordan*, 1998 WL 68879 at *5. Plaintiffs filed this lawsuit in June 1994, six months after MDC decided to close Tulsa and one full month before the Tulsa plant was officially closed. Thus, at a time when MDC certainly possessed the documents relevant to the Tulsa closure, it was on notice to preserve those documents. In fact, MDC was *required* to maintain these documents under United States regulations mandating the disclosure of these documents as a justification of future pricing. Each time these documents were requested, however, MDC offered patently bogus substitutes: Defendant's Trial Exhibit 21, the document attached to its summary judgment motion; Defendant's Trial Exhibit 28, the so-called final report with the conspicuously absent financial analysis; and, finally, Defendant's Trial Exhibit 88, the one-page, undated financial analysis. To this must be added Defendant's post-trial document production which is incomplete with the December 3, 1993 government disclosure, the

Witte files and William Austin's calendar either missing or destroyed.

271. In addition, the Court finds that Defendant's failure to produce the government disclosure documents demonstrates that Plaintiffs' case was materially prejudiced.

272. The Court finds that Defendant's obstruction of discovery, including the failure to answer interrogatories, deposition and trial questions truthfully, and its destruction or nonproduction of documents warrants the sanction of striking MDC's defense that Tulsa closed for financial reasons related to excess capacity. Defendant's defense cannot be permitted to go forward given the pattern of discovery abuse that occurred in this case. Defendant has made material misstatements of fact in discovery, refused to produce documents, falsely and repeatedly claimed that it had produced all responsive documents, and it sought to avoid the testimony of the central financial figure in this matter, William Austin.

273. This Court has authority to enter judgment for Plaintiffs or some lesser sanction. Rule 37(d) provides that a Court confronted with a party who fails to respond to a Rule 34 request for documents "may make such orders in regard to the failure as are just, and among others it may take any action authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of this rule." Fed.R.Civ.P. 37(d). The nonexclusive remedies of subdivision (b)(2) include striking the pleadings, barring a party from opposing a claim or defense, and dismissing or entering a default judgment against the offending party. Fed.R.Civ.P. 37(b)(2). *See, e.g., Jones v. Thompson,* 996 F.2d 261, 264 (10th Cir. 1993) (dismissing action for "many transgressions" in discovery). A litigant can also be sanctioned under Rule 37 for making false statements to the Court regarding the state of discovery. *Simon,* 165

F.R.D. at 652–55. Discovery violations predicated on "willfulness, bad faith, or [some] fault of petitioner" may warrant more severe sanctions, including default judgment. *Archibeque v. A.T. & S.F. Ry. Co.,* 70 F.3d 1172, 1174 (10th Cir.1995)

274. Courts have also invoked Rule 37 to sanction parties for destroying or withholding documents properly requested during the course of discovery. *See, e.g., Valley Engineers, Inc. v. Electric Engineering Co.,* 158 F.3d 1051, 1056–58 (9th Cir.1998) (upholding dismissal of Defendant's counterclaim as Rule 37 sanction for withholding crucial document); *Telectron Inc. v. Overhead Door Corp.,* 116 F.R.D. 107, 128–30 (S.D.Fla.1987) (relying in part on Rule 37 to sanction a party for destroying documents). *Jordan F. Miller Corp. v. Mid-Continent Aircraft Service, Inc.,* 1998 WL 68879 *3 (10th Cir. February 20, 1998). District Courts may invoke this inherent power when presented with the spoliation of evidence. *Jordan,* 1998 WL 68879 at *4. "Spoliation occurs when evidence relevant to prospective civil litigation is destroyed, adversely affecting the ability of a litigant to prove his or her claim." *Patel v. OMH Medical Center, Inc.,* 987 P.2d 1185, 1999 WL 252740 *12 (Okla. April 27, 1999).

275. The Court concludes that striking MDC's defense that it acted solely for financial reasons unrelated to pension and benefit savings related to excess capacity results in a verdict for Plaintiffs on the basis of the circumstantial evidence of discrimination they put forward at trial as discussed in the Court's Findings of Fact and its Conclusions of Law with respect to the merits of this case.

For the alternative reasons set forth above, the Court hereby enters judgment in favor of Plaintiffs and against Defendant on the issue of liability in this case.

## IV. *CONCLUSION*

The record in this case clearly establishes liability by Defendant to Plaintiffs. This conclusion is compelled both on the merits and as a result of appropriate sanctions for abuses during the discovery process and throughout this litigation.

As the above-stated Findings of Fact and Conclusions of Law make clear, the Court approached the legal issues in this lawsuit with extreme caution. Indeed, the business judgment rule should control and protect business decisions except in the most unique of circumstances. This case presents the most unique of circumstances. MDC was informed at the summary judgment stage that summary judgment would be granted in its favor upon the disclosure of the financial basis for Defendant's business judgment to close the Tulsa facility. Such disclosure never occurred. Instead, Defendant embarked upon a remarkable course of obstruction, inconsistent representations, and outright falsehoods. The sworn testimony at trial confirmed a history of deception and bad faith by the company and laid bare that discovery in this case was replete with the same duplicity that marked Defendant's treatment of its employees and the public at large.

With respect to the merits, the Supreme Court set forth in *Reeves v. Sanderson Plumbing Prod., Inc.* the appropriate analytical framework by which to consider a proffered explanation that is wholly lacking in credibility. *Reeves,* of course, should be applied only in the most narrow of instances. This is such an instance. To find for Defendant would be to ignore *Reeves* and the wisdom of recognizing that an utterly false explanation and claimed basis for conduct is highly probative on the issue of wrongdoing.

With respect to discovery, and other acts by Defendant during the course of this litigation, to find for Defendant would be to legitimize abject disregard for the requirements of the Federal Rules of Civil Procedure. Failure to respond to discovery and repeated false statements under oath throughout this lawsuit compels sanctions of the most serious kind.

For the reasons set forth above, the Court hereby finds in favor of Plaintiffs and against Defendant on the issue of liability. The parties are hereby ordered to file no later than three (3) weeks from the file date of this Order a joint status report setting forth a proposal as to the most effective manner in which to proceed in this case.